# UNITED STATES *v.* HAYS ET AL.

No. 94–558.   Argued April 19, 1995—Decided June 29, 1995*

---

*Together with No. 94–627, *Louisiana et al.* v. *Hays et al.,* also on appeal from the same court.

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, in which SOUTER, J., joined, *post*, p. 750. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 750. GINSBURG, J., concurred in the judgment.

*Richard P. Ieyoub, Jr.*, Attorney General of Louisiana, argued the cause for the state appellants. With him on the briefs were *Roy A. Mongrue, Jr.*, and *Angie Rogers LaPlace*, Assistant Attorneys General, and *Paul R. Baier*. Solicitor General Days argued the cause for the United States. With him on the briefs were *Assistant Attorney General Patrick, Deputy Solicitor General Bender, Irving L. Gornstein, Jessica Dunsay Silver*, and *Mark L. Gross*.

*Edward W. Warren* argued the cause for appellees. With him on the brief were *Christopher Landau* and *Jay P. Lefkowitz.*†

JUSTICE O'CONNOR delivered the opinion of the Court.

We held in *Shaw* v. *Reno*, 509 U. S. 630 (1993), that a plaintiff may state a claim for relief under the Equal Protection Clause of the Fourteenth Amendment by alleging that a State "adopted a reapportionment scheme so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race,

---

†Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Laughlin McDonald, Neil Bradley*, and *Steven R. Shapiro;* for the Congressional Black Caucus by *A. Leon Higginbotham, Jr.*, and *Pamela S. Karlan;* for the National Bar Association et al. by *Koteles Alexander* and *Brian J. Murphy;* and for Bernadine St. Cyr et al. by *Elaine R. Jones, Theodore M. Shaw, Norman J. Chachkin, Charles Stephen Ralston, Jacqueline A. Berrien, Thomas J. Henderson, Brenda Wright, J. Gerald Hebert,* and *Robert B. McDuff.*

Briefs of *amici curiae* urging affirmance were filed for the Pacific Legal Foundation by *Anthony T. Caso* and *Deborah J. La Fetra;* for the South Carolina Senate et al. by *Mark A. Packman* and *Benjamin E. Griffith;* and for Ruth O. Shaw et al. by *Robinson O. Everett* and *Clifford Dougherty.*

*William H. Mellor III* filed a brief for the Institute for Justice as *amicus curiae.*

and that the separation lacks sufficient justification." *Id.*, at 658. Appellees Ray Hays, Edward Adams, Susan Shaw Singleton, and Gary Stokley claim that the State of Louisiana's congressional districting plan is such a "racial gerrymander," and that it violates the Fourteenth Amendment. But appellees do not live in the district that is the primary focus of their racial gerrymandering claim, and they have not otherwise demonstrated that they, personally, have been subjected to a racial classification. For that reason, we conclude that appellees lack standing to bring this lawsuit.

## I

Louisiana has been covered by § 4(b) of the Voting Rights Act of 1965 (VRA), 79 Stat. 438, as amended, 84 Stat. 315, 42 U. S. C. § 1973b(b), since November 1, 1964, see 28 CFR pt. 51, App. The effect of such coverage is set forth in VRA § 5, 42 U. S. C. § 1973c: Whenever a covered jurisdiction "shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964," it must first either obtain a declaratory judgment from the United States District Court for the District of Columbia that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," or receive "preclearance" from the Attorney General to the same effect. Any redistricting plan in Louisiana is subject to these requirements.

Accordingly, in 1991, Louisiana submitted to the Attorney General for preclearance a districting plan for its Board of Elementary and Secondary Education (BESE). Louisiana's BESE districts historically have paralleled its congressional districts, so the submitted plan contained one majority-minority district (that is, a district "in which a majority of the population is a member of a specific minority group," *Voinovich* v. *Quilter,* 507 U. S. 146, 149 (1993)) out of eight, as

did Louisiana's congressional districting plan then in force.*
The Attorney General refused to preclear the plan, claiming
that Louisiana had failed to demonstrate that its decision not
to create a second majority-minority district was free of
racially discriminatory purpose. See Defense Exh. 17 in
No. 92–1522 (WD La.) (letter from U. S. Dept. of Justice, As-
sistant Attorney General John Dunne, to Louisiana Assist-
ant Attorney General Angie R. LaPlace, Oct. 1, 1991). The
Attorney General subsequently precleared a revised BESE
plan, which contained two majority-minority districts. See
Brief for Appellants State of Louisiana et al. 3, n. 2.

As a result of the 1990 census, Louisiana's congressional
delegation was reduced from eight to seven representatives,
requiring Louisiana to redraw its district boundaries. Per-
haps in part because of its recent experience with the BESE
districts, the Louisiana Legislature set out to create a dis-
tricting plan containing two majority-minority districts.
See, e. g., Tr. 11 (Aug. 19, 1993). Act 42 of the 1992 Regular
Session, passed in May 1992, was such a plan. One of Act
42's majority-minority districts, District 2, was located in the
New Orleans area and resembled the majority-minority dis-
trict in the previous district map. The other, District 4, was
"[a] Z-shaped creature" that "zigzag[ged] through all or part
of 28 parishes and five of Louisiana's largest cities." Con-
gressional Quarterly, Congressional Districts in the 1990s,
p. 323 (1993). A map of Louisiana's congressional districts

---

*Between Reconstruction and the early 1980's, all of Louisiana's con-
gressional districts contained a majority of white citizens, and it had not
elected any black congressional representatives. In 1983, a three-judge
court invalidated Louisiana's 1982 districting plan, on the ground that it
diluted minority voting strength in the New Orleans area in violation of
VRA § 2, 42 U. S. C. § 1973, and ordered the legislature to draw up a new
plan. See Major v. Treen, 574 F. Supp. 325 (ED La. 1983). The new plan
contained a majority-black district in the New Orleans area; in 1990, that
district elected Louisiana's first black representative since Reconstruc-
tion. See Congressional Quarterly, Congressional Districts in the 1990s,
pp. 319–320 (1993).

under Act 42 is attached as Appendix A. The Attorney General precleared Act 42.

Appellees Hays, Adams, Singleton, and Stokley are residents of Lincoln Parish, which is located in the north-central part of Louisiana. According to the complaint, all but Singleton reside in that part of Lincoln Parish that was contained in the majority-minority District 4 of Act 42. See Pet. for Permanent Injunction and Declaratory Judgment in No. CV 92–1522 (WD La.), p. 4. In August 1992, appellees filed suit in state court, challenging Act 42 under the State and Federal Constitutions, as well as the VRA. The State removed the case to the United States District Court for the Western District of Louisiana, and, as required by the VRA, a three-judge court convened to hear the case pursuant to 28 U. S. C. § 2284. After a 2-day trial, the District Court denied appellees' request for a preliminary injunction, denied the state and federal constitutional claims, and took the VRA claims under advisement. While the case was pending, this Court decided *Shaw* v. *Reno*, whereupon the District Court revoked its prior rulings and held another 2-day hearing. Focusing almost exclusively on the oddly shaped District 4, the District Court decided that Act 42 violated the Constitution, and enjoined its enforcement. See *Hays* v. *Louisiana*, 839 F. Supp. 1188 (WD La. 1993) *(Hays I)*.

Louisiana appealed directly to this Court, pursuant to 28 U. S. C. § 1253. While the appeal was pending, the Louisiana Legislature repealed Act 42 and enacted a new districting plan, Act 1 of the 1994 Second Extraordinary Session. The Attorney General precleared Act 1. We then vacated the District Court's judgment and remanded the case "for further consideration in light of Act 1." 512 U. S. 1230 (1994). A map of Act 1 is attached as Appendix B.

Act 1, like Act 42, contains two majority-minority districts, one of which (District 2) is again located in the New Orleans area. The second majority-minority district in Act 1, however, is considerably different from that in Act 42. While

Act 42's District 4 ran in a zigzag fashion along the northern and eastern borders of the State, Act 1's District 4 begins in the northwestern part of the State and runs southeast along the Red River until it reaches Baton Rouge. For present purposes, the most significant difference between the two district maps is that in Act 42, part of Lincoln Parish was contained in District 4, while in Act 1, Lincoln Parish is entirely contained in District 5.

On remand, the District Court allowed appellees to amend their complaint to challenge Act 1's constitutionality and permitted the United States to intervene as a defendant. It then held another 2-day hearing and concluded, largely for the same reasons that it had invalidated Act 42, that Act 1 was unconstitutional. See *Hays* v. *Louisiana*, 862 F. Supp. 119 (WD La. 1994) *(Hays II)*. The court enjoined the State from conducting any elections pursuant to Act 1, substituted its own districting plan, and denied the State's motion for a stay of judgment pending appeal.

Louisiana and the United States appealed directly to this Court. We stayed the District Court's judgment, 512 U. S. 1273 (1994), and noted probable jurisdiction, 513 U. S. 1056 (1994).

II

The District Court concluded that appellees had standing to challenge Act 42, see *Hays I*, 839 F. Supp., at 1192, but did not reconsider standing when faced with Act 1. The question of standing is not subject to waiver, however: "[W]e are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc.* v. *Dallas*, 493 U. S. 215, 230–231 (1990) (citations omitted).

It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First,

the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992) (footnote, citations, and internal quotation marks omitted); see also, *e. g.*, *Allen* v. *Wright*, 468 U. S. 737, 751 (1984); *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982). In light of these principles, we have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power. See, *e. g.*, *Valley Forge Christian College, supra; Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208 (1974); *United States* v. *Richardson*, 418 U. S. 166 (1974); *Ex parte Lévitt*, 302 U. S. 633 (1937) *(per curiam).* We have also made clear that "it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 189 (1936), 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.' *Warth* v. *Seldin*, 422 U. S. 490, 518 (1975)." *FW/PBS, supra,* at 231. And when a case has proceeded to final judgment after a trial, as this case has, "those facts (if controverted) must be 'supported adequately by the evidence adduced at trial'" to avoid dismissal on standing grounds. *Lujan, supra,* at 561 (quoting *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 115, n. 31 (1979)).

The rule against generalized grievances applies with as much force in the equal protection context as in any other. *Allen* v. *Wright* made clear that even if a governmental actor is discriminating on the basis of race, the resulting injury "accords a basis for standing only to 'those persons who are

personally denied equal treatment' by the challenged discriminatory conduct." 468 U. S., at 755 (quoting *Heckler* v. *Mathews*, 465 U. S. 728, 740 (1984)); see also *Valley Forge Christian College, supra,* at 489–490, n. 26 (disapproving the proposition that every citizen has "standing to challenge every affirmative-action program on the basis of a personal right to a government that does not deny equal protection of the laws"). We therefore reject appellees' position that "anybody in the State has a claim," Tr. of Oral Arg. 36, and adhere instead to the principles outlined above.

We discussed the harms caused by racial classifications in *Shaw.* We noted that, in general, "[t]hey threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." 509 U. S., at 643. We also noted "representational harms" the particular type of racial classification at issue in *Shaw* may cause: "When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Id.,* at 648. Accordingly, we held that "redistricting legislation that is so bizarre on its face that it is 'unexplainable on grounds other than race' demands the same close scrutiny that we give other state laws that classify citizens by race." *Id.,* at 644 (citation omitted). Any citizen able to demonstrate that he or she, personally, has been injured by that kind of racial classification has standing to challenge the classification in federal court.

Demonstrating the individualized harm our standing doctrine requires may not be easy in the racial gerrymandering context, as it will frequently be difficult to discern why a particular citizen was put in one district or another. See *id.,* at 646 (noting "the difficulty of determining from the face of a single-member districting plan that it purposefully distinguishes between voters on the basis of race"). Where a

plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action, cf. *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville,* 508 U. S. 656 (1993). Voters in such districts may suffer the special representational harms racial classifications can cause in the voting context. On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference. Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.

In this litigation, appellees have not produced evidence sufficient to carry the burden our standing doctrine imposes upon them. Even assuming (without deciding) that Act 1 causes injury sufficient to invoke strict scrutiny under *Shaw,* appellees have pointed to *no* evidence tending to show that *they* have suffered that injury, and our review of the record has revealed none. Neither Act 1 itself, see App. to Juris. Statement for Louisiana et al. 111–120; Appendix B, *infra,* nor any other evidence in the record indicates that appellees, or any other residents of Lincoln Parish, have been subjected to racially discriminatory treatment. The record does contain evidence tending to show that the legislature was *aware* of the racial composition of District 5, and of Lincoln Parish. We recognized in *Shaw,* however, that "the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination." 509 U. S., at 646. It

follows that proof of "[t]hat sort of race consciousness" in the redistricting process is inadequate to establish injury in fact. *Ibid.*

Appellees urge that District 5 is a "segregated" voting district, and thus that their position is no different from that of a student in a segregated school district, see Brief for Appellees 17 (citing *Brown* v. *Board of Education,* 347 U. S. 483 (1954)); Tr. of Oral Arg. 33. But even assuming, *arguendo,* that the evidence in this litigation is enough to state a *Shaw* claim with respect to District 4, that does not prove anything about the legislature's intentions with respect to District 5, nor does the record appear to reflect that the legislature intended District 5 to have any particular racial composition. Of course, it may be true that the racial composition of District 5 would have been different if the legislature had drawn District 4 in another way. But an allegation to that effect does not allege a cognizable injury under the Fourteenth Amendment. We have never held that the racial composition of a particular voting district, without more, can violate the Constitution. Cf. *Shaw, supra,* at 644–649; *Mobile* v. *Bolden,* 446 U. S. 55 (1980).

Appellees insist that they challenged Act 1 in its entirety, not District 4 in isolation. Tr. of Oral Arg. 36. That is true. It is also irrelevant. The fact that Act 1 *affects* all Louisiana voters by classifying each of them as a member of a particular congressional district does not mean—even if Act 1 inflicts race-based injury on *some* Louisiana voters—that *every* Louisiana voter has standing to challenge Act 1 as a racial classification. Only those citizens able to allege injury "as a direct result of having *personally* been denied equal treatment," *Allen,* 468 U. S., at 755 (emphasis added), may bring such a challenge, and citizens who do so carry the burden of proving their standing, as well as their case on the merits.

Appellees' reliance on *Powers* v. *Ohio,* 499 U. S. 400 (1991), is unavailing. *Powers* held that "[a]n individual juror does

not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race." *Id.*, at 409. But of course, where an individual juror is excluded from a jury because of race, that juror has *personally* suffered the race-based harm recognized in *Powers*, and it is the fact of *personal* injury that appellees have failed to establish here. Thus, appellees' argument that "they *do* have a right not to be placed into or excluded from a district because of the color of their skin," Brief for Appellees 16, cannot help them, because they have not established that *they* have suffered such treatment in this litigation.

JUSTICE STEVENS agrees that appellees lack standing, but on quite different grounds: In his view, appellees' failure to allege and prove vote dilution deprives them of standing, irrespective of whether they have alleged and proved the injury discussed in *Shaw. Post*, at 751; see also *Miller* v. *Johnson, post*, at 931 (STEVENS, J., dissenting). Justice White's dissenting opinion in *Shaw* argued that position, see *Shaw*, 509 U. S., at 659 ("Appellants have not presented a cognizable claim, because they have not alleged a cognizable injury"); *post*, at 751–752 (quoting Justice White's dissent in *Shaw*), but it did not prevail. JUSTICE STEVENS offers no special reason to revisit the issue here.

We conclude that appellees have failed to show that they have suffered the injury our standing doctrine requires. Appellees point us to no authority for the proposition that an equal protection challenge may go forward in federal court absent that showing of individualized harm, and we decline appellees' invitation to approve that proposition in this litigation. Accordingly, the judgment of the District Court is vacated, and the cases are remanded with instructions to dismiss the complaint.

*It is so ordered.*

JUSTICE GINSBURG concurs in the judgment.

## APPENDIX A TO OPINION OF THE COURT

APPENDIX B TO OPINION OF THE COURT

JUSTICE BREYER, with whom JUSTICE SOUTER joins, concurring.

I join the Court's opinion to the extent that it discusses voters, such as those before us, who do not reside within the district that they challenge.

JUSTICE STEVENS, concurring in the judgment.

The majority apparently would find standing under *Shaw* v. *Reno*, 509 U. S. 630 (1993), for plaintiffs of all races who resided in an electoral district in which "the legislatur[e] reli[ed] on racial criteria" to classify all voters, *ante*, at 745, and who could show that they were "'placed into or excluded from a district because of the color of their skin,'" *ante*, at 747 (citing Brief for Appellees 16). The majority fails to explain coherently how a State discriminates invidiously by deliberately joining members of different races in the same district; why such placement amounts to an injury to members of any race; and, assuming it does, to whom.

The term "gerrymander" has long been understood to mean "any set of districts which gives some advantage to the party which draws the electoral map." P. Musgrove, General Theory of Gerrymandering 6 (1977). As Justice Powell noted, "a colorable claim of discriminatory gerrymandering presents a justiciable controversy under the Equal Protection Clause." *Davis* v. *Bandemer*, 478 U. S. 109, 185 (1986) (dissenting opinion); see also *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960). The complaint in this litigation, however, did not allege a discriminatory gerrymander. Appellees made no claim that any political or racial majority had drawn district lines to disadvantage a weaker segment of the community. Indeed, the complaint did not even identify the race or the political affiliation of any of the appellees. It simply alleged that every voter in Louisiana was injured by being deprived of the right "to participate in a process for electing members of the House of Representatives which is

color-blind and wherein the right to vote is not limited or abridged on account of the designated race or color of the majority of the voters placed in the designated districts." Pet. for Permanent Injunction and Declaratory Judgment in No. CV 92–1522 (WD La.), p. 8, ¶ 29.

Because the Court does not recognize standing to enforce " 'a personal right to a government that does not deny equal protection of the laws,'" *ante*, at 744 (citing *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 489–490, n. 26 (1982)), it holds that the mere fact of appellees' Louisiana residency does not give them standing. I agree with that conclusion. What I do not understand is the majority's view that these racially diverse appellees should fare better if they resided in black-majority districts instead of white-majority districts. Appellees have not alleged or proved that the State's districting has substantially disadvantaged any group of voters in their opportunity to influence the political process. They therefore lack standing to argue that Louisiana has adopted an unconstitutional gerrymander. See *Davis*, 478 U. S., at 125, 132–133. Even under a standing analysis that applied a more lenient rule for the victims of racial gerrymandering, see *id.*, at 151–152 (O'CONNOR, J., concurring in judgment), appellees could not prevail, because they fail to allege having been "shut out of the political process." *Id.*, at 139 (opinion of White, J.).

Accordingly, I cannot join the Court's opinion. I would simply hold that appellees have not made out the essential elements of a gerrymandering claim for the same reasons set forth in Justice White's dissenting opinion in *Shaw*:

"Because districting inevitably is the expression of interest group politics, and because 'the power to influence the political process is not limited to winning elections,' the question in gerrymandering cases is 'whether a particular group has been unconstitutionally denied

its chance to effectively influence the political process.' Thus, 'an equal protection violation may be found only where the electoral system *substantially disadvantages certain voters in their opportunity to influence the political process effectively.'" *Shaw*, 509 U. S., at 662–663 (quoting *Davis*, 478 U. S., at 132–133) (emphasis in original).

Because these appellees have not alleged any legally cognizable injury, I agree that they lack standing. I therefore concur in the judgment.