**M.T. MEHDI and Ghazi Khankan, Plaintiffs,**

v.

**UNITED STATES POSTAL SERVICE, Marvin Runyon, Postmaster General, and Bob Fearnley, Director of Consumer Affairs, Defendants.**

No. 96 Civ. 5658(SS).

United States District Court, S.D. New York.

Dec. 23, 1997.

M.T. Mehdi, Ph.D., New York City, pro se.

U.S. Department of Justice, United States Attorney, New York City, Jeffrey Oestericher, Assistant United States Attorney, for Defendant.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

This case presents an issue not uncommon in a pluralistic society such as ours. Plaintiffs M.T. Mehdi and Ghazi Khankan are Muslims who object to the fact that, during the winter holiday season, some post offices are decorated with symbols primarily associated with the Christmas and Chanukah celebrations—specifically, Christmas trees and menorahs—yet there is no similar recognition of Muslim celebrations also taking place during December. The plaintiffs allege that they have asked the Postal Service to correct this situation and have either been ignored or

refused. They have turned to this Court seeking injunctive relief in the form of an order requiring the Postal Service to display the Muslim Crescent and Star in conjunction with other holiday decorations or, alternatively, to remove any sectarian symbols from its holiday displays. The defendants argue that their display policy is violative neither of the plaintiffs' First Amendment nor Fifth Amendment Due Process rights, and have moved for judgment on the pleadings or, in the alternative, summary judgment. For the reasons to be stated, the defendants' motion is granted.

## BACKGROUND

Except where otherwise noted, the following facts are taken from the amended complaint. Plaintiffs Mehdi and Khankan are American Muslims. Dr. Mehdi is, or at least was at the time of filing the complaint, the secretary-general of the National Council on Islamic Affairs. He has worked, successfully in many cases, to persuade the operators of various public buildings and facilities to display the Crescent and Star, "secular symbol of the Muslim people" (Complaint ¶ 9), during the month of December along with Christmas and Chanukah displays (Complaint ¶ 4; Ex. 2). The display of the Crescent and Star is in celebration of USA Muslims Day, a holiday falling on the third Friday of December in which American Muslims are urged to host parties, exchange gifts and cards, inculcate their children with Islamic ideals, and "express appreciation for the bounty we enjoy in our new country and to express pride in Islam's contributions to the human civilization." (Complaint Ex. 1).

The defendant United States Postal Service ("USPS") is an independent agency within the Executive Branch of the United States, see 39 U.S.C. § 201, charged with providing postal service to the nation, see 39 U.S.C. § 101(a). According to plaintiffs, the USPS has at times displayed Christmas trees and Chanukah menorahs in its post offices, including the Manhattan General Post Office on Eighth Avenue and Thirty-third Street, without also displaying the Crescent and Star. (Complaint ¶ 28). Other post offices around the nation have done the same. (Complaint ¶ 4). The plaintiffs have written to these post offices individually as well as to the Postmaster General requesting the addition of the Crescent and Star whenever the Christmas tree and menorahs are displayed, but have uniformly been refused. *Id.; see also* Decl. of Patricia M. Gibert, Vice-President, Retail, USPS, ¶ 10 (USPS unaware of any postmaster which has displayed Crescent and Star on post office property).

Plaintiffs then filed this *pro se* action in this Court,[1] asking for injunctive relief in the form of an order to the USPS "to decorate its headquarters, all its branches, their lobbies and other facilities with the Crescent and Star as it decorates those facilities with the Christmas tree and Hanukkah Menorah" or, alternatively, "to order removal of all sectarian symbols which create different classes of citizens." (Complaint p. 11). The plaintiffs have not clearly articulated the constitutional or statutory provisions alleged to be violated by the USPS's refusal to display the Crescent and Star, but the Court construes the complaint to raise claims under the Free Speech and Establishment Clauses of the First Amendment, and under the equal protection component of the Fifth Amendment Due Process Clause.

## DISCUSSION

Summary judgment[2] is required when "there is no genuine issue as to any material

1. Plaintiffs filed their first complaint on November 30, 1995, but in an order dated July 29, 1996, Chief Judge Thomas Griesa directed the plaintiffs to file an amended complaint which alleged specific instances in which the USPS had displayed Christmas trees and Chanukah menorahs but had refused to display the Crescent and Star. Plaintiffs filed their amended complaint on September 23, 1996.

2. Because the Court refers to matters outside the pleadings in determining this motion with respect to some of the plaintiffs' claims, the Court will treat the motion as one for summary judgment as to all claims, even for those where judgment on the pleadings would be appropriate. *See* Fed.R.Civ.P. 12(c). The defendants' motion was clearly denominated as one inviting summary judgment in the alternative, so plaintiffs were on notice that the Court might go beyond

fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party has the initial burden of 'informing the district court of the basis for its motion' and identifying the matter 'it believes demonstrate[s] the absence of a genuine issue of material fact.'" *Leibovitz v. Paramount Pictures Corp.,* 948 F.Supp. 1214, 1217 (S.D.N.Y. 1996) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Once the movant satisfies its initial burden, the non-moving party must identify "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In assessing the parties' competing claims, the Court must resolve any factual ambiguities in favor of the nonmovant. *See McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993). It is within this framework that the Court must finally determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

Preliminarily, the Court begins by noting that although this case is ultimately about speech, the complaint could be read in two ways, depending upon just who is doing the speaking. On the one hand, the claims raised could be understood to be a complaint about Postal Service restrictions on the *plaintiffs'* speech—namely, that the plaintiffs wish to display the Muslim Crescent and Star in post offices but are being forbidden access to that forum in contravention of their Free Speech rights. Alternatively, the complaint could be read to assert plaintiffs' objection to the *Postal Service's* speech—i.e., that by putting up Christmas and Chanukah displays but not displaying the Muslim Crescent and Star, the Postal Service is favoring Christians and Jews but disfavoring Muslims in violation of the Establishment Clause. *See Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 765–66, 115 S.Ct. 2440, 2448, 132 L.Ed.2d 650 (1995)(plurality o pinion)(distinguishing between "'*government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.'")(quoting *Board of Educ. of Westside Community Schools (Dist.66) v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990)(O'Connor, J., concurring)).[3] Although the complaint sounds primarily in the Establishment Clause interpretation (for example, the plaintiffs seek an injunction from this Court either to "order the [defendants] to decorate ... its branches ... with the Crescent and Star" or to "order removal of all sectarian symbols"), the Court will, consistent with its obligation to read *pro se* litigants' complaints liberally, *see, e.g., Branham v. Meachum,* 77 F.3d 626, 628 (2d Cir. 1996), consider both of the above interpretations to be asserted. In addition, both interpretations are amenable to analysis under the Equal Protection component of the Fifth Amendment Due Process Clause.[4]

As a further matter, although the complaint does note at least one specific instance in which a post office displayed Christmas and Chanukah decorations without displaying the Muslim Crescent and Star, and also alleges several other instances in which post offices declined a request by plaintiffs to display the Muslim symbols, the plaintiffs' challenge is in the nature of a facial attack—that is, plaintiffs allege a blanket policy by

---

the pleadings; moreover, plaintiffs submitted additional evidence in their reply and in fact agreed that summary judgment was in order (Pl. Opp. Mem. at 4). *See Feaser v. City of New York,* 1997 WL 724810, at *2 (S.D.N.Y.1997) (where motion asks for summary judgment in the alternative and opposing party submits additional evidence, proper to convert motion for judgment on pleadings without further notice to parties).

**3.** Plaintiffs specifically disclaim that the Crescent and Star have any religious significance themselves, *see* Complaint ¶ 19, and thus the Court does not construe the complaint to assert a claim that the USPS has "burdened [plaintiff's] exercise of religion," *Genas v. State of New York,* 75 F.3d 825, 831 (2d Cir.1996), in violation of the Free Exercise Clause.

**4.** The Due Process Clause of the Fifth Amendment has been interpreted to impose a duty of Equal Protection on the federal government identical to that imposed upon the states by the Fourteenth Amendment. *See Nicholas v. Tucker,* 114 F.3d 17, 19–20 (2d Cir.1997).

the Postal Service of excluding the Crescent and Star and seek to have this Court issue injunctive relief against the Postal Service in its entirety. The plaintiffs have furnished this Court with no evidence of specific post office configurations, nor of specific holiday displays that are alleged to be unconstitutional. Plaintiffs are, in effect, asking this Court to rule that for post offices to display Christmas trees and menorahs without either displaying the Muslim Crescent and Star or allowing interested parties to do so is *per se* unconstitutional. In making such a broad attack, the plaintiffs have assumed a heavy burden. They must demonstrate that "no set of circumstances exists" under which the Postal Service policy—if indeed it has one—of displaying Christmas trees and menorahs but not the Crescent and Star "would be valid." *See Davidson v. Mann,* 129 F.3d 700, 701 (2d Cir.1997).

## I. Free Speech

■ A First Amendment claim that the government is impermissibly restricting a speaker's access to government property is controlled by the now-familiar tripartite forum analysis. *See General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 278–79 (2d Cir.1997). Under this analysis, government property falls into one of three classifications: (1) traditional public fora, consisting of " 'places which by long tradition or by government fiat have been devoted to assembly and debate,' " *id.* at 278 (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3448–49, 87 L.Ed.2d 567 (1985)); (2) designated public fora, places " 'not traditionally open to assembly and debate' but 'which the State has opened for use by the public as a place for expressive activity,' " *id.* (quoting *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448–49, and *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983)); and (3) nonpublic fora, consisting of "all remaining public property." *Id.* at 278. "The extent to which the Government can control access depends on the nature of the relevant forum." *United States v. Kokinda,* 497 U.S. 720, 726, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990) (plurality opinion).

Governmental intent is the "touchstone" for determining into which category a particular property falls. *General Media,* 131 F.3d at 278–79. Generally speaking, "when the state reserves property for its 'specific official uses,' it remains nonpublic in character." *Id.* (quoting *Capitol Square,* 515 U.S. at 761, 115 S.Ct. at 2446 (1995)). In addition, "dedication of property to a commercial enterprise is 'inconsistent with an intent to [create] a public forum.' " *Id.* at 278–79 (quoting *Cornelius,* 473 U.S. at 804, 105 S.Ct. at 3450).

■ There is little question that the Postal Service is essentially a commercial enterprise—delivering mail and packages for its customers in return for payment. *See Kokinda,* 497 U.S. at 732, 110 S.Ct. at 3122–23 ("Congress has directed the Service to become a self-sustaining service industry ....."). Its facilities are, in the main, reserved for the specific purpose of "accomplish[ing] the most efficient and effective postal delivery system." *Id.; see* 39 U.S.C. § 403(b)(3) (responsibility of Postal Service is to maintain post offices "of such character" that customers will have "ready access to essential postal services"); 39 U.S.C. § 101(g) (Postal Service policy regarding new postal facilities must emphasize, *inter alia,* "a maximum degree of convenience for efficient postal services"). Plaintiffs have pointed to no evidence that suggests that the Postal Service intent with regards to its facilities is to accomplish any other purpose than effective delivery of the mails.

Moreover, in *Longo v. United States Postal Service,* 983 F.2d 9 (2d Cir.1992), the Second Circuit held that a walkway in the interior of a post office in Torrington, Connecticut was a nonpublic forum. Expressly adopting the analysis of the plurality opinion in *Kokinda,* the *Longo* court held that because the walkway was used "solely for the purpose of assisting patrons of the post office to get from the parking lot to the front door of the post office," it was therefore a nonpublic forum. *Id.* at 11. Although the *Longo* holding involved only a particular post office, and mindful that the inquiry into intent is "inherently factual," *General Media,* 131 F.3d at 279, if a walkway whose sole purpose

is to allow access to the post office is a nonpublic forum, it follows virtually *a fortiori* that the post offices themselves are nonpublic fora. *See also United States v. Belsky,* 799 F.2d 1485, 1489 (11th Cir.1986) (ingress and egress walkways to post office are a nonpublic forum); *United States v. Bjerke,* 796 F.2d 643 (3d Cir.1986) (same).

 The plaintiffs attempt to distinguish *Longo* on the grounds that unlike the walkway in *Longo,* here the government is speaking—namely, through displays of Christmas and/or Chanukah symbols which might be put up in post offices pursuant to the seasonal display policy. This distinction is unavailing. Forum analysis turns on the access which the government provides to the *public* for expressive activity. *See, e.g., Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (government creates public forum "only by intentionally opening a nontraditional forum for *public* discourse")(emphasis added). The fact that the *government* is speaking does not turn an otherwise nonpublic forum into a public one. *See, e.g., Greer v. Spock,* 424 U.S. 828, 838 n. 10, 96 S.Ct. 1211, 1217 n. 10, 47 L.Ed.2d 505 (1976) (government's invitation of speakers "did not of itself serve to convert Fort Dix into a public forum"); *United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 130 n. 6, 101 S.Ct. 2676, 2685 n. 6, 69 L.Ed.2d 517 (1981) (rejecting contention that "simply because an instrumentality is used for the communication of ideas or information it thereby becomes a public forum"); *cf. Rust v. Sullivan,* 500 U.S. 173, 194, 111 S.Ct. 1759, 1773, 114 L.Ed.2d 233 (1991) (government's choice to promote one viewpoint does not require it to fund opposing viewpoints). This is consonant with the principle that in a nonpublic forum, the state's actions are "most analogous to that of a private owner." *Paulsen v. County of Nassau,* 925 F.2d 65, 69 (2d Cir. 1991). If the government's speech on its own property by itself turned that property into a public forum, virtually all government facilities would become public fora open for a wide range of expressive activity. The First Amendment does not require this. *See International Soc. for Krishna Consciousness v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) ("[I]t is also well settled that the government need not permit all forms of speech on property that it owns and controls."); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974) (plurality opinion) ("Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.").

 The Court again notes that the facial nature of this challenge does not require this Court to find that *all* Postal Service facilities are necessarily nonpublic fora, nor could the Court do so based on the evidence presented. There may very well be, for example, individual post offices in this nation which have long been used for public debate so as to become traditional public fora, or that the Postal Service has devoted some areas to some form of public debate so as to turn them into designated or limited public fora. What the Court does reject, however, is the plaintiffs' contention that post offices are *necessarily* public fora; *Longo,* and the principles of forum analysis, foreclose such a possibility.

 In nonpublic fora, the government has wide latitude in regulation of speech, it may even be, as here, content-based as long as it is "reasonable" and "not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *General Media,* 131 F.3d at 279. In other words, in a nonpublic forum, content regulation is judged by a reasonableness standard, while viewpoint discrimination is "subject to much more exacting constitutional scrutiny." *Id.* at 281.

The Postal Service's seasonal display policy, on its face, does not discriminate amongst speakers based on viewpoint. Rather, it prohibits the public from posting *any* seasonal display, regardless of the holiday. *See* Postal Operations Manual (POM) 124.55, 124.57.[5]

---

**5.** POM 124.55(e) does allow the public to post "secular holiday decorations" on bulletin boards

in post office lobbies, including "evergreen trees (provided that only nonreligious ornaments are

Plaintiffs have adduced no evidence suggesting, nor do they even allege, that the Postal Service is allowing the public to display Christmas trees and Chanukah menorahs on its premises. At most, then, the Postal Service is engaging in content regulation (*e.g.*, the public may conduct political discourse on the exterior of postal premises, *see* POM 124.54(b), but may not put up seasonal displays), which is subject only to a test of reasonableness.

■ To be constitutional then, the seasonal display policy must only be "reasonable in light of the purpose of the forum and reflect a legitimate government concern." *General Media*, 131 F.3d at 282. It need not be narrowly tailored, *see Cornelius*, 473 U.S. at 809, 105 S.Ct. at 3452, nor the "most reasonable or only reasonable limitation." *General Media*, at 282.

Defendants have devoted most of their argument to discussing the rationale for displaying symbols traditionally associated with the holidays of Christmas and Chanukah and not for USA Muslims Day—namely, that the former holidays have substantial impact on Postal Service business while the latter does not. As briefed, this argument is, however, largely irrelevant to the Free Speech analysis. It is undisputed that any seasonal displays in the post offices are put there by the postmasters; therefore this rationale seeks to explain why the *government* as speaker chooses to express certain ideas but not others—a concern not of the Free Speech clause but rather of the Establishment Clause, if at all. The Free Speech analysis centers on the reason why the Postal Service prohibits the *plaintiffs* (and the public in general) from certain expressive activity—i.e., seasonal displays.

used)" and "menorahs." Plaintiffs have not alleged that they attempted to place a Muslim star and crescent on a post office bulletin board and were denied that opportunity, and the Court thus does not address the issue of whether such a denial would constitute viewpoint discrimination. Rather, plaintiffs' complaint is directed at the large-scale lobby and building decorations. *See* Complaint ¶ 4 (referring to Christmas tree as "usually 20 feet high" and the Menorah as "10 to 15 feet"); ¶¶ 11, 24, 25, 30 (referring to displays in lobbies of post offices).

■ Implicit, however, in the Postal Service's explanation is the idea that the Postal Service views the decoration of its facilities as a means of promoting its business, and that its business can best be promoted by adorning its facilities with symbols of holidays which generate increased business. It follows, if by nothing more than "common sense," *see Kokinda*, 497 U.S. at 734–35, 110 S.Ct. at 3123–24 (plurality) (sufficient, under reasonableness review, to uphold regulation banning solicitation in post offices based on "common sense" description of disruption caused by solicitation), that opening up post offices to seasonal displays by the public would interfere with the Postal Service's own use of decoration to further its business. This reasoning is more than sufficient to meet the low threshold of reasonableness.

In sum, most if not all Postal Service facilities would be considered nonpublic fora, and the Postal Service's prohibition of seasonal displays by the public is a reasonable restriction designed to further its business. The plaintiffs have failed to produce any evidence suggesting the contrary, and summary judgment for the defendants on the Free Speech claim is thus proper.

## II. Establishment Clause

The Court now turns to the second view of the plaintiffs' case: that the Postal Service, not the plaintiffs, is the speaker. Plaintiffs complaint is that the Postal Service, by displaying Christmas and Chanukah symbols, is expressing favoritism for these holidays—and by implication, the religions of Christianity and Judaism—while disfavoring Muslims and their religion of Islam. This assertion implicates the Establishment Clause of the First Amendment.[6]

**6.** The Court notes that there is some question as to whether plaintiffs have standing to maintain this claim at all. As discussed in the Equal Protection analysis, *infra*, the plaintiffs would not have standing *qua* Muslims to challenge the purely dignitary harm of the USPS's alleged favoring of other religions over Islam. However, plaintiffs do have standing as taxpayers to challenge government expenditures, made pursuant to Congress's taxing and spending power, as violative of the Establishment Clause. *See Bowen v. Kendrick*, 487 U.S. 589, 618–20, 108 S.Ct. 2562, 2579–80, 101 L.Ed.2d 520 (1988); *Flast v.*

■ The "principle at the heart of the Establishment Clause" is "that government should not prefer one religion to another, or religion to irreligion." *Board of Educ. of Kiryas Joel v. Grumet,* 512 U.S. 687, 702–04, 114 S.Ct. 2481, 2491, 129 L.Ed.2d 546 (1994). To pass Establishment Clause muster a state-sponsored display must, at a minimum, pass the "endorsement test": "Would a reasonable observer of the display in its particular context perceive a message of governmental endorsement or sponsorship of religion?" *Elewski v. City of Syracuse,* 123 F.3d 51, 53 (2d Cir.1997). This hypothetical observer "must be deemed aware of the history and context of the community and forum in which the religious display appears." *Creatore v. Town of Trumbull,* 68 F.3d 59, 61 (2d Cir.1995)(quoting *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 773–74, 779–80, 115 S.Ct. 2440, 2452, 2455, 132 L.Ed.2d 650 (1995)).

■ On the issue of display of religious symbols during the holiday season, this Court is not writing on a clean slate. It is bound by Supreme Court precedent which, while not a model of clarity, is nonetheless dispositive of the plaintiffs' claim.

In *County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Supreme Court, in a badly fractured decision, held that the display by municipal authorities of Pittsburgh and Allegheny County of a Christmas tree and menorah together did not violate the Establishment Clause. No clear rationale emerged from the Court. Justices Blackmun and O'Connor applied the endorsement test—"whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices,'" *id.* at 597, 109 S.Ct. at 3103 (Blackmun, J.)(quoting *School District of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985))—and determined that no endorsement or disapproval was indicated. Justice Blackmun reasoned that Christmas and Chanukah have "attained a secular status in our society." *Allegheny,* 492 U.S. at 616, 109 S.Ct. at 3113 (Blackmun, J.) and that "the overall display must be understood as conveying the city's secular recognition of different traditions for celebrating the winter-holiday season," *id.* at 620, 109 S.Ct. at 3115 (Blackmun, J.). Justice O'Connor on the other hand found that, although both symbols are religious, the combination of the two "conveyed a message of pluralism and freedom of belief during the holiday season." *Id.* at 635, 109 S.Ct. at 3123 (O'Connor, J.). Justice Kennedy, writing for himself and three other Justices, also allowed the display but rejected the endorsement test, instead relying on the fact the display fell well within "the government accommodation and acknowledgment of religion that has marked our history from the beginning," *id.* at 663, 109 S.Ct. at 3138 (Kennedy, J.), and did not represent "proselytizing" by the government. *Id.* at 660, 109 S.Ct. at 3136 (Kennedy, J.).

Extending *Allegheny* to other contexts is not an easy task. As noted above, the endorsement test is the law of this circuit,

---

Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

The Second Circuit in *In re U.S. Catholic Conference,* 885 F.2d 1020, 1027–28 (1989), held that taxpayers did not have standing to challenge the IRS administration of a congressional tax exemption program because there was no assertion that the congressional enactment itself was an Establishment Clause violation, a holding which would arguably apply in this case because plaintiffs do not contend that the congressional authorization of USPS spending is *itself* unconstitutional. However, the Circuit subsequently held In *Lamont v. Woods,* 948 F.2d 825, 829–31 (1991) that taxpayers did have standing to challenge how an agency spent funds authorized to it by Congress, even though Congress did not *man-*

date that the agency spend it in the manner alleged to violate the Establishment Clause. *Catholic Conference* was distinguished on the grounds that there the IRS was alleged to be acting *ultra vires* its congressional grant of authority. *Id.* at 831. Because there is no allegation here that the USPS is acting beyond its statutory authority, the Court believes that *Lamont* controls and that the plaintiffs have standing as taxpayers.

The Court also notes that plaintiffs have not specifically alleged in their complaint that they are taxpayers. Given the *pro se* status of the plaintiffs, and given the Court's disposition of the Establishment Clause on the merits, however, the Court will assume they pay taxes to entitle them to standing.

however tenuous its status might be at the Supreme Court level. Of the Justices in *Allegheny* who applied the endorsement test, however, only two (Blackmun and O'Connor) found the combination Christmas tree and menorah to pass, and given Justice Kennedy's attack on the endorsement test as invalidating practices which he believed permissible under the Establishment Clause, it is not clear that Justice Kennedy would have reached the same result had he applied the test. However, the specific holding of *Allegheny*—that at least in some instances the state-sponsored display of a Christmas tree and menorah together does not violate the Establishment Clause—garnered a majority of the Court and is therefore binding precedent.

That holding is sufficient to defeat the plaintiffs' claim in this case. The Postal Service seasonal display policy in question allows postmasters to display, *inter alia*, "evergreen trees bearing nonreligious ornaments" and "menorahs (when displayed in conjunction with other seasonal matter)." POM 124.57(c). This policy was no doubt crafted by the Postal Service with *Allegheny* in mind. Whether the policy is in *all* cases constitutional is impossible to determine; one can certainly imagine a case in which the "other seasonal matter" displayed with a menorah served to enhance the religious aspects of the menorah rather than diminish them. The Court need not decide that issue, however, because the facial nature of the plaintiffs' challenge requires only that the Court find *some* applications of the policy to be constitutional, and *Allegheny* forecloses a finding to the contrary. The plaintiffs' claim under the Establishment Clause must therefore also fail.

III. Equal Protection

■ Finally, the plaintiffs assert an Equal Protection claim—namely, that the Postal Service policy impermissibly discriminates against Muslims and/or Arabs. The Court first notes that a claim that the Postal Service is discriminating against Muslims by refusing to display the Crescent and Star would seem to collapse into the Establishment Clause claim. The plaintiffs have asserted, and adduced evidence to the Court, that the Crescent and Star are not themselves part of Islam, and for purposes of this summary judgment motion the Court must accept that as true. Plaintiffs assert, however, that they are symbols of the Muslim people. "Muslim" is defined as "an adherent of or believer in Islam," Webster's Third New International Dictionary (1986), and plaintiffs have not suggested to this court an alternative definition. To discriminate against Muslims *qua* Muslims would thus seem to fall squarely within the Establishment Clause's injunction that "government . . . may not discriminate among persons on the basis of their religious beliefs and practices." *Allegheny*, 492 U.S. at 590, 109 S.Ct. at 3099. The Court, however, has already rejected a claim that the Postal Service policy violates the Establishment Clause.

However, the Court is willing, for purposes of this motion, to accept that Muslims could be considered a cultural or quasi-ethnic group that is defined other than by adherence to Islam, much as one might (although this is subject to debate) consider being Jewish as an ethnic or quasi-ethnic identity distinct from Jews as adherents of Judaism. *Cf. Allegheny*, 492 U.S. at 585, 109 S.Ct. at 3097 (noting that "some nonreligious American Jews celebrate Chanukah as an expression of ethnic identity, and 'as a cultural or national event, rather than as a specifically religious event.'"). The Court will thus assume that discrimination against Muslims is distinct from government disapproval of Islam, and that therefore the Establishment Clause analysis is not dispositive of this claim.

Like the First Amendment claims already addressed, this Equal Protection claim can be viewed in two lights. First, the plaintiffs could be claiming that the Postal Service is preventing the plaintiffs from putting up the Crescent and Star in post offices while allowing other groups to display their symbols. However, this claim fails because, as noted, the Postal Service prohibits *all* displays by the public of seasonal symbols, and plaintiffs have not produced any evidence suggesting the contrary. In order to prove a claim of discrimination in violation of Equal Protec-

tion, "a plaintiff must show not only that the state action complained of had a disproportionate or discriminatory impact but that also the defendant acted with the intent to discriminate." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir.1987). At the very least, to survive summary judgment on this claim, plaintiffs would have to produce evidence suggesting that the Postal Service has allowed other, non-Muslim or non-Arab members of the public to erect seasonal displays in post offices. Plaintiffs have not even *alleged* these facts in their complaint, and thus summary judgment for defendants is appropriate.

█ Alternatively, plaintiffs claim could be that the Postal Service, by erecting displays celebrating non-Muslim cultural traditions but failing to similarly treat Muslim heritage, is implicitly making a statement that Muslims are, in the plaintiffs' words, "second-class citizens." (Complaint ¶ 29.) It is important to distinguish this injury from that constituted by the previous characterization. In the former claim, the plaintiffs seek to proclaim and celebrate their heritage yet are prevented from doing so by act of the government. The harm is palpable, direct and concrete—plaintiffs lose the opportunity to speak in their chosen forum and to add their voices to the holiday celebrations of others.

The alternative reading—*i.e.*, the Postal Service is refusing to celebrate Muslim heritage on equal footing with non-Muslim—asserts a very different claim. The harm alleged flows from the fact that the voice of the government—uniquely authoritative as the voice of the people—is expressing the idea that Muslim heritage is less worthy of celebration, or that Muslims are somehow inferior persons. It is a purely dignitary injury.

The Court does not for a moment suggest that such a harm is not every bit as serious as the more "concrete" injury asserted by the first Equal Protection claim. On the contrary, to the plaintiffs, who have clearly worked extensively to promote the inclusion of Muslim heritage and culture at many different public venues where non-Muslim holidays are celebrated, this dignitary harm is no doubt precisely what troubles them most. Nevertheless, Supreme Court precedent compels the conclusion that the plaintiffs lack standing to raise this claim.[7]

Standing is essentially an inquiry into whether a plaintiff is the proper party to invoke the jurisdiction of the federal courts. *See Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute . . . ."). "[S]tanding is not merely a prudential inquiry into whether a court should exercise jurisdiction, but is rooted in Article III's 'case' or 'controversy' requirement and reflects separation of powers principles." *In re U.S. Catholic Conference*, 885 F.2d 1020, 1023 (2d Cir.1989). To have standing, a plaintiff must demonstrate that (1) " they have suffered an injury in fact that is both concrete in nature and particularized to them," (2) "the injury [is] fairly traceable to the defendants' conduct," and (3)"the injury [is] redressable by the removal of defendants' conduct." *Id.* at 1023–24. The plaintiffs in this case fail to satisfy the first prong of this test.

In *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the parents of African–American school children whose districts were undergoing desegregation sued the Internal Revenue Service for failing to carry out the IRS's obligation to deny tax-exempt status to private schools which discriminated on the basis of race. The Court distinguished between two claims made by the parents: (1) that plaintiffs were "harmed directly by the mere fact of government financial aid to discriminatory private schools," *id.* at 752, 104 S.Ct. at 3325, a claim characterized by the Court as "a claim of stigmatic injury, or denigration, suffered by all members of a racial group when the Government discriminates on the basis of race," *id.* at 754, 104 S.Ct. at 3326, and (2) that the federal tax

---

**7.** Although defendants did not raise the standing issue in their motion papers, it was asserted as an affirmative defense in their answer. (Answer p. 8). In any event, because standing is an element of subject matter jurisdiction, the Court is required to raise the issue *sua sponte*. *See United States v. Hays*, 515 U.S. 737, 742–44, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995).

exemptions "impair[ed] their ability to have their public schools desegregated." *Id.* at 752–53, 104 S.Ct. at 3325. The latter claim was held to satisfy the injury prong of standing, while the former did not.[8]

Addressing the first claim, the Court asserted that while the stigmatizing injury caused by discrimination "is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing," *id.* at 755, 104 S.Ct. at 3326, "such injury accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Id.* (quoting *Heckler v. Mathews,* 465 U.S. 728, 739–40, 104 S.Ct. 1387, 1395–96, 79 L.Ed.2d 646 (1984)). Like the plaintiffs in *Allen,* the plaintiffs in this case "do not allege a stigmatic injury suffered as a direct result of having personally been denied equal treatment," *Id.* 468 U.S. at 755, 104 S.Ct. at 3327, and thus have not stated a judicially cognizable injury.

The Court noted in *Allen* that "if the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating . . . . All such persons could claim the same sort of abstract stigmatic injury . . . ." *Id.* at 755–56, 104 S.Ct. at 3327. Plaintiffs' claim in this case is precisely the same: if the harm of having the Postal Service refuse to display the star and crescent is cognizable, every Muslim in the nation would have standing to sue. No less so than in *Allen,* "recognition of standing in such circumstances would transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Id.* at 756, 104 S.Ct. at 3327 (quoting *United States v. SCRAP,* 412

U.S. 669, 687, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973)).

The Supreme Court recently reaffirmed this principle in *United States v. Hays,* 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). In *Hays,* the plaintiffs were citizens of Louisiana who alleged that the state legislature had violated the Equal Protection clause by creating a majority-minority congressional district—but, critically, not the district in which plaintiffs resided. The Court dismissed their complaint for lack of standing, relying on *Allen,* and specifically rejecting the contention that *all* voters in the state had standing. *Id.* 515 U.S. at 742–46, 115 S.Ct. at 2435–36. The Court reiterated that to have standing, a plaintiff must assert more than "a generalized grievance against government conduct of which he or she does not approve," *id.* at 745, 115 S.Ct. at 2436, but rather must allege injury "'as a direct result of having *personally* been denied equal treatment.'" *Id.* at 746, 115 S.Ct. at 2437 (quoting *Allen,* 468 U.S. at 755, 104 S.Ct. at 3327). Plaintiffs in this case have not alleged a personal denial of equal treatment, and thus any claim that the Postal Service has denied the plaintiffs equal protection by refusing to put up the Muslim Crescent and Star must be dismissed for want of standing.[9]

### *CONCLUSION*

For the reasons discussed above, defendants' motion to dismiss is GRANTED. The Clerk of the Court is directed to enter judgment dismissing this action in its entirety in accordance with this Opinion and Order.

**SO ORDERED.**

---

8. The Court actually went on to hold that the plaintiffs lacked standing to assert the second claim because they had not satisfied the "fairly traceable" requirement. *Allen,* 468 U.S. at 756, 104 S.Ct. at 3327.

9. It may go without saying, but the fact that plaintiffs have asked the Postal Service to put up a Crescent and Star and have been refused does not constitute the "personal" denial of equal treatment required to support standing. The

plaintiffs in *Allen* were not required to achieve standing by first asking the IRS to stop the practices complained of; such an interpretation would improperly turn standing into nothing more than a quasi-administrative exhaustion hurdle. Instead, *Allen* held that mere dignitary harm resulting from the government's actions, without more, is not enough to confer standing upon a plaintiff.