ROGERS, Circuit Judge,
dissenting:
The Establishment Clause prevents “the Government’s placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services,” Engel v. Vitale, 370 U.S. 421, 429, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), and ensures that “all creeds ... be tolerated and none favored,” Lee v. Weisman, 505 U.S. 577, 590, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); see McCreary County v. Am. Civ. Liberties Union of Ky., 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). A governmental accommodation for religion may violate the Establishment Clause if it “singles out a particular religious sect for special treatment” because “whatever the limits of permissible ... accommodations may be ..., it is clear that neutrality as among religions must be honored.” Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 706-07, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (citations omitted). “ ‘When the power, prestige and financial support of government [are] placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.’ ” Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 221, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (quoting Engel, 370 U.S. at 430-31, 82 S.Ct. 1261).
In Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C.Cir.2006), the court thus observed that the liberty interest shielded by the Establishment Clause is “protection against government imposition of a state religion or religious preference,” id. at 302 (emphasis added). Stating that “the Establishment Clause is implicated as soon as the government engages in impermissible action,” id., the court explained that unlike freedom of expression cases, for example, “[t]he harm inflicted by religious establishment is self-executing and requires no attendant conduct on the part of the individual,” id. at 303; see also id. at 302. In describing the impermissible government action at issue, the court stated:
Where, as here, the charge is one of official preference of one religion over another, such governmental endorsement “sends a message to nonadherents [of the favored denomination] that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.”
*766 Id. at 302 (quoting Lynch v. Donnelly, 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring)) (alteration in original). The court held that such an allegation sufficed to show irreparable harm, or “injury [that is] beyond remediation [by monetary damages],” id. at 297, for the purpose of obtaining injunc-tive relief, crediting appellants’ allegation of “the harm that flows from the ‘forbidden message’ of marginalization [that the Navy’s] actions send to [them],” id. at 299 (quoting Appellants’ Br. at 20). The court did not expressly hold that appellants[1] had Article III standing, but see Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), but noted that its legal “conclusion presupposes, of course, that the party has standing to allege such a violation,” Chaplaincy, 454 F.3d at 304 n. 8.
The court’s decision in Chaplaincy regarding appellants’ liberty interest that is protected by the Establishment Clause and the nature of their injury is no less applicable here. The same parties and the same charge are involved, see LaShawn A. v. Barry, 87 F.3d 1389, 1393-95 (D.C.Cir.1996) (en banc), and injury sufficient for irreparable harm has resonance for injury-in-fact under Article III, see Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1508 (D.C.Cir.1995), because to show irreparable harm “[a] plaintiff must do more than merely allege ... harm sufficient to establish standing,” Associated Gen. Contractors of Cal., Inc. v. Coal, for Econ. Equity, 950 F.2d 1401, 1410 (9th Cir.1991). As explained in Chaplaincy, “[t]his court has set a high standard for irreparable injury” within the preliminary injunction inquiry. 454 F.3d at 297. Such injury must be “both certain and great,” “actual and not theoretical,” “beyond remediation,” and also “of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.” Id. (quotation marks and citations omitted). For Article III, the requisite injury-in-fact must be “concrete and particularized” and “actual or imminent,” not “hypothetical.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotation marks omitted). Because “the Navy’s alleged violation of the Establishment Clause per se constitutes irreparable harm,” Chaplaincy, 454 F.3d at 299, appellants have met their burden on the injury prong of Article III standing.[2]
As members of non-liturgical Protestant churches and fellowships, appellants assert that the Navy has singled out the Catholic faith as the preferred religious tradition in its Chaplain Corps by choosing over several decades to allow only Catholic chaplains to serve beyond the required separation dates.[3] This sends a message of denomi *767 national preference for Catholics and marginalization for non-Catholic adherents, causing appellants to suffer psychological harm while serving as chaplains. Compl. ¶¶ 3, 37(e), 39. By endowing Naval officer status in a preferential manner upon the representatives of a particular type of religious ministry,[4] who then, as part of their Naval service duties, use words and symbols to serve their religious cause, the Navy allegedly has “take[n] sides in a religious matter, effectively discriminating in favor of [one religion’s] view,” Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d 415, 425 (2d Cir.2002), of the type of religious ministry that is most appropriate to serve “the religious needs of sailors,” In re England, 375 F.3d 1169, 1171 (D.C.Cir.2004). See, e.g., McCreary County, 545 U.S. at 860, 125 S.Ct. 2722; Kiryas Joel Vill., 512 U.S. at 698-705, 114 S.Ct. 2481.
Appellants have suffered particularized Article III injury because they are not strangers to the Navy’s 4109 program. Their membership within the Chaplain Corps and their resulting receipt of a message of denominational preference make them comparable to a citizen who has “personal contact with the alleged establishment of religion,” Suhre v. Haywood County, 131 F.3d 1083, 1086 (4th Cir.1997), such as in the religious display cases.[5] Appellants’ charge does more than present a “creative analogy” with “some surface logic,” Op. at 765, as the court offers no basis for its unsupported conclusion that this case is different from “the distinct context of the religious display and prayer cases,” id. As counsel for the Navy acknowledged, “if a chaplain ... is personally exposed to a [message of religious preference], there would be traditional standing.” Oral Arg. Tr. at 13 (Apr. 24, 2008). That is what appellants allege in charging that the 4109 program establishes an “official preference of one religion over another” that causes them psychological injury due to their personal and *768 direct receipt of the “ ‘message ... that they are outsiders, not full members’ ” of the Navy’s Chaplain Corps. Chaplaincy, 454 F.3d at 302 (quoting Lynch, 465 U.S. at 688, 104 S.Ct. 1355 (O’Connor, J., concurring)). Appellants’ injury is thus as particularized, see Lujan, 504 U.S. at 561 n. 1, 573-74, 112 S.Ct. 2130; Warth v. Seldin, 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), as that of the children in Schempp, 374 U.S. at 223-24, 83 S.Ct. 1560, to whom school prayers were read, the plaintiffs in Women’s Equity Action League (WEAL) v. Cavazos, 879 F.2d 880, 884-85 (D.C.Cir.1989), who were enrolled or employed in segregated schools, and the state legislator in Marsh v. Chambers, 463 U.S. 783, 786 n. 4, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), who objected “as a member of the Legislature” to the use of a state-employed chaplain to convene its sessions. As members of a statutorily-defined community within the armed forces, appellants are not mere bystanders, Allen v. Wright, 468 U.S. 737, 756, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), and they did not “roam the country,” Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, 454 U.S. 464, 487, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), in search of impermissible government action.[6]
The uniqueness of appellants’ injury as chaplains in relation to their service in the Navy Chaplain Corps eliminates the concern expressed in Valley Forge that recognizing their standing would, in this court’s words, inappropriately “wedge open the courthouse doors,” Op. at 765; see also id. at 762, 764. Appellants’ charge is based on an injury distinct to their status within the Chaplain Corps, see Schempp, 374 U.S. at 224 n. 9, 83 S.Ct. 1560; Chaplaincy, 454 F.3d at 302; see also WEAL, 879 F.2d at 884-85, and, “like Schempp before it, Valley Forge recognized that direct contact with an unwelcome religious exercise or display works a personal injury distinct from and in addition to each citizen’s general grievance against unconstitutional government conduct,” Suhre, 131 F.3d at 1086. Their alleged “genuine feeling of exclusion from the community ..., and the deep offense from a perceived insult to one’s religious view committed by the government in one’s community,” Ariz. Civ. Liberties Union v. Dunham, 112 F.Supp.2d 927, 935 (D.Ariz.2000); see Suhre, 131 F.3d at 1087; Saladin, 812 F.2d at 692-93, demonstrates that appellants have suffered a personal injury-in-fact.
To reach the opposite conclusion, the court ignores both the nature of appellants’ charge and binding precedent. First, the court describes the charge as if it concerns only religious discrimination in traditional monetary terms, such as retirement benefits not denied to appellants or “discrimination suffered by others.” See Op. at 758-59, 759, 760-61, 764. Yet appellants do not so delimit their charge; *769 rather, they allege that the Navy’s 4109 program violates the Establishment Clause by creating a government religious preference, see Chaplaincy, 454 F.3d at 302.[7] Appellants’ standing thus does not hinge upon the mistreatment of any individual chaplain but upon the Navy’s alleged endorsement of a preference for another religious faith that directly affects them. The court’s narrow focus ignores the Constitution’s requirement that, in assessing constitutional injury, “we keep in mind ‘the myriad, subtle ways in which Establishment Clause values can be eroded,’ ” and that in addition to the mistreatment of an individual, “we [must] guard against other different, yet equally important, constitutional injuries,” such as the unconstitutional implementation of a government policy. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 314, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (quoting Lynch, 465 U.S. at 694, 104 S.Ct. 1355 (O’Connor, J., concurring)).
Second, the court states that “mere personal offense” or emotional injury is never enough for Article III injury, Op. at 763, but that is not the law.[8] As the Supreme Court acknowledged in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), “[a] person ... may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause” if directly affected by the challenged governmental practice, id. at 154, 90 S.Ct. 827 (citing Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844); see Valley Forge, 454 U.S. at 486-87 & n. 22, 102 S.Ct. 752. Later, in Allen, 468 U.S. at 755, 104 S.Ct. 3315, while holding that a plaintiff alleging an equal protection violation generally must claim a personal denial of equal treatment, the Supreme Court observed that “[t]here can be no doubt that ... noneconomic injury [such as stigmatizing injury] is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing.”[9] In fact, the Supreme Court has reached the merits in numerous Establishment Clause cases where “mere personal offense,” Op. at 761-62, resulting from a plaintiffs connection to a challenged practice appears to have provided the main possible injury to ground standing.[10] As the Fourth Circuit has observed:
*770 [T]he Establishment Clause plaintiff is not likely to suffer physical injury or pecuniary loss. Rather the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion. Accordingly, rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable.
Suhre, 131 F.3d at 1086 (quotation marks and citations omitted); see supra note 5.
Equally problematic is the court’s attempt to contrast appellants’ case with those where the government has, in the court’s words, “actively and directly com-municat[ed] a religious message through religious words or religious symbols,” Op. at 764. Establishment Clause precedent is not so conveniently cabined into the narrow circumstances described by the court, where the government itself “engag[ed] in religious speech,” id. For one thing, the government need not intentionally favor one religious denomination over another in order to violate the Establishment Clause if its action has such an effect.[11] When considering whether a government action has the effect of conveying a denominational endorsement, “[t]he question of governmental neutrality is not concluded by the observation that [a policy] on its face makes no discrimination between religions.” Gillette v. United States, 401 U.S. 437, 452, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). Equally important, there also is no requirement that the government go so far as to use “religious words or religious symbols,” Op. at 764, to establish an unconstitutional religious endorsement. Rather, “the Establishment Clause forbids subtle departures from neutrality, ‘religious gerrymanders,’ as well as obvious abuses.” Gillette, 401 U.S. at 452, 91 S.Ct. 828 (quoting Walz v. Tax Comm’n, 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring)). And, “the most basic command of the Establishment Clause — not to prefer some religions (and thereby some approaches to indoctrinating religion) to others” — does not apply only to a government action such as a prayer or ceremony that explicitly adopts a denomination’s chosen religious symbols, but also to other action taken in the usual course of government regulation or operation. Univ. of Great Falls v. NLRB, 278 F.3d 1335, 1346 (D.C.Cir.2002) (citing Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982)); see, e.g., Mt. Royal Joint Venture, 477 F.3d at 748; Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 294 (5th Cir.2001). Thus, government action that draws a line around a religious denomination in a community can send a symbolic message of preference that needs no words just as easily as the government’s direct presentation of a religious symbol. See, e.g., Kiryas Joel Vill., 512 U.S. at 697, 114 S.Ct. 2481 (citing Larkin, 459 U.S. at 125-26, 103 S.Ct.505).
The court ignores all of this precedent in adopting the novel conception that appel *771 lants are not harmed for purposes of standing under the Establishment Clause unless the Navy itself directly uses religious words or symbols as occurred in the religious display cases, Op. at 763, 764-65. Rather than distinguish precedent in a reasoned manner, the court’s holding is the assertion that “[w]hen plaintiffs are not themselves affected by a government action except through their abstract offense at the message allegedly conveyed by that action, they have not shown injury-in-fact to bring an Establishment Clause claim, at least outside the distinct context of the religious display and prayer cases.” Id. at 764-65 (emphasis in original). Yet, “[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from ‘making adherence to a religion relevant in any way to a person’s standing in the ... community,’ ” County of Allegheny, 492 U.S. at 594, 109 S.Ct. 3086 (quoting Lynch, 465 U.S. at 687, 104 S.Ct. 1355 (O’Connor, J., concurring)) (emphasis added), and so directs the government to avoid a practice that “may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the [government] to enforce a religious orthodoxy,” Lee, 505 U.S. at 592, 112 S.Ct. 2649 (emphasis added). Moreover, when a court reaches the merits “[i]n cases involving [government] participation in a religious activity” — such as the employment of Navy chaplains as religious ministry professionals — the question is “whether an objective observer ... would perceive [its action] as a [governmental] endorsement” of religion. Santa Fe Indep. Sch. Dist., 530 U.S. at 308, 120 S.Ct. 2266 (quotation marks omitted). Even so secular an act as the grant of a copyright, this court held, ran aground because providing exceptional copyright benefits to a particular religious institution “bestowed upon the Church ... symbolic recognition as guardian of the [contested] text,” with consequent practical advantages, and “ha[d] the unmistakable effect of advancing the Church’s cause.” United Christian Scientists, 829 F.2d at 1171. Although the religious institution alone used religious words and symbols, the government’s unusual treatment of one church “unequivocally and unqualifiedly endorsed [it] as first interpreter and guardian of th[e] [copyrighted] work.” Id. at 1170; see also Commack, 294 F.3d at 425.
Here, within the context of their chaplaincy assignments and in the absence of a legitimate explanation, the 4109 program could fairly be understood as a religious endorsement because it has the effect of selecting particular “religious words and symbols,” Op. at 764, to play an enhanced role within the Navy Chaplain Corps by specially retaining only representatives of the Catholic faith for extended service in which they engage in religious speech on behalf of that Corps. See Santa Fe Indep. Sch. Dist., 530 U.S. at 307-09, 120 S.Ct. 2266. The job of a 4109 chaplain, as for all chaplains, requires representing a particular denomination as a “religious ministry professional,” an “individual endorsed to represent a religious organization and to conduct its religious observances or ceremonies.” Instruction 1304.28, Guidance for the Appointment of Chaplains for the Military Departments ¶¶ 6, E.2.1.9 (Dep’t of Def. June 11, 2004); see England, 375 F.3d at 1171.[12] So understood, due to appellants’ direct exposure to the 4109 program’s preference for Catholics, the Navy conveys to them the “message ... that [as nonadherents of the favored de *772 nomination] they are outsiders, not full members of the ... community,” McCreary County, 545 U.S. at 860, 125 S.Ct. 2722 (quotation marks omitted), for “the government! ] [appears to be] lending its support to the communication of a religious organization’s religious message,” County of Allegheny, 492 U.S. at 601, 109 S.Ct. 3086; see Larkin, 459 U.S. at 125-26, 103 S.Ct. 505; Commack, 294 F.3d at 425; United Christian Scientists, 829 F.2d at 1170-71, and thus causes them psychological harm as Navy chaplains that is cognizable under the Establishment Clause.
In any event, whether the Navy’s 4109 program sends a prohibited message is a merits question that is not before the court, see Info. Handling Servs., Inc. v. Def. Automated Printing Servs., 338 F.3d 1024, 1029 (D.C.Cir.2003). Of course, the court’s premature determination of this issue may arise from the realization that if a personally observed religious message causes harm “there would be traditional standing,” as the Navy’s counsel acknowledged, Oral Arg. Tr. at 13; see also id. at 18-22. At this point in the proceedings in determining Article III standing, however, the court must assume the merits of appellants’ charge that the Navy’s 4109 program “d[oes], in fact, convey” a message of denominational preference directly harming them as chaplains. Vasquez, 487 F.3d at 1251; see Warth, 422 U.S. at 500, 502, 95 S.Ct. 2197; Info. Handling Servs., 338 F.3d at 1029; City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C.Cir.2003).
Under the Establishment Clause, then, appellants’ membership in a narrowly defined community — the Navy Chaplain Corps — directly affected by the 4109 program, and the message this program communicates to them as chaplains particularizes their injury-in-fact, for “[t]he practices of [one’s] own community may create a larger psychological wound than someplace [one is] just passing through,” Washegesic, 33 F.3d at 683, by making one feel like a “second class citizen! ],” Saladin, 812 F.2d at 693; see Suhre, 131 F.3d at 1090. This directly follows from Chaplaincy and Supreme Court precedent, both of which the court misconstrues. Because appellants’ injury-in-fact is traceable to the Navy’s 4109 program and is likely to be redressed by holding that the program is unlawful and enjoining preferential treatment of 4109 chaplains and the message it sends to appellants, they also meet the other prongs of the standing test, see Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130.
Accordingly, I would reverse the denial of the motion for a preliminary injunction and leave for the district court to determine upon remand whether appellants have otherwise met the requirements for obtaining a preliminary injunction, see Chaplaincy, 454 F.3d at 305, and respectfully dissent. Because appellants have Article III standing, I do not reach the question whether they also have taxpayer standing.

. Due to the consolidation of three cases, appellants include active duty, reserve, retired, and former non-liturgical Protestant Navy chaplains as in Chaplaincy, and two endorsing agencies — Chaplaincy of Full Gospel Churches and Associated Gospel Churches. Hereinafter in referring to "appellants,” I refer only to the chaplains currently serving in the Navy Chaplain Corps.

. To the extent the court seeks to avoid this precedent by interpreting a footnote in Chaplaincy to indicate that the court was "presupposing” appellants' standing, Op. at 762-63, and thus addressing the request for in-junctive relief without satisfying itself that appellants had standing, its approach is contrary both to the principle in Steel Co., 523 U.S. at 94-95, 118 S.Ct. 1003, and to the more natural reading of the footnote as merely recognizing, as this court has done before, that this prong of the preliminary injunction inquiry and the entirety of the Article III standing inquiry "overlap[] ... somewhat," but are not coextensive, see Taylor, 56 F.3d at 1508.

.According to appellants, "the 4109 program” has three parts: (1) illegal appointments to active duty through age waivers for over-age Catholic clergy, (2) the consequent *767 illegal continuation of such clergy as chaplains to the age of 67, and (3) the eventual illegal transfer of such clergy to the Retired Reserve and subsequent recall to active duty as designated 4109 Reservists. The program is designed in part to allow Catholic chaplains who have reached their statutory separation age to continue to serve until they have completed twenty years of service and become eligible for pensions. See 10 U.S.C. §§ 1251, 14509, 14703; see also Chaplaincy, 454 F.3d at 293-96. At the time appellants filed their complaints, the age limit for the appointment of chaplains, like other officers, was forty-two, see 10 U.S.C. § 532(a)(2); while this provision is no longer applicable to chaplains, id. at § 532(d)(1) (as amended by Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub.L. No. 108-375, 188 Stat. 1811, 1872 (Oct. 28, 2004)), the statutory separation age for chaplains and other officers remains in effect.

. Appellants cite a list of Catholic chaplains coded as "4109” currently serving with them in the Navy Chaplain Corps, and assert that additional chaplains are destined to become 4109 chaplains in view of the Navy's list of Catholics appointed after age forty-two and extended on active duty and the dates they become eligible for pensions. For example, non-liturgical Protestant Chaplain Stewart served with over-age Catholic Chaplain Eres-tain. After this court's decision in Chaplaincy, it appears that the Navy extended two non-Catholic chaplains for service beyond the age of 62. See 454 F.3d at 295.

. See, e.g., Vasquez v. L.A. County, 487 F.3d 1246, 1250-51 (9th Cir.2007); Doe v. Tangipahoa Parish Sch. Bd., 473 F.3d 188, 196 (5th Cir.2006); ACLU Neb. Found. v. City of Plattsmouth, 358 F.3d 1020, 1026-31 (8th Cir.2004), adopted in relevant part, 419 F.3d 772, 774 n. 4 (8th Cir.2005) (en banc); Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 72 (2d Cir.2001); Washegesic v. Bloomingdale Pub. Schs., 33 F.3d 679, 682-83 (6th Cir.1994); Doe v. County of Montgomery, 41 F.3d 1156, 1159-60 (7th Cir.1994); Foremaster v. City of St. George, 882 F.2d 1485, 1490-91 (10th Cir.1989); Saladin v. City of Milledgeville, 812 F.2d 687, 691-93 (11th Cir.1987); Allen v. Hickel, 424 F.2d 944, 947 (D.C.Cir.1970).

. Contrary to the court’s suggestion, Op. at 764, Valley Forge included no indication that the Supreme Court questioned the plaintiffs' standing on the ground that a government land transfer to a religious institution could not send a message of government endorsement of religion and thus violate the Establishment Clause. The Court based its Article III holding on the fact that the plaintiffs did not live in the state where the land transfer had occurred, had learned about it indirectly through a press release, and indicated no connection with the transfer that could personalize their stake in the suit. See 454 U.S. at 486-87, 102 S.Ct. 752; see also ASARCO Inc. v. Kadish, 490 U.S. 605, 616, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). As our sister circuits have held, Valley Forge's holding, 454 U.S. at 485-87, 102 S.Ct. 752, suggests that "[t]he neighbors in Valley Forge,” Op. at 764, may be the very plaintiffs who would have had standing there. See, e.g., Suhre, 131 F.3d at 1087; Washegesic, 33 F.3d at 682-83; ACLU of Ga. v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098, 1106-07 (11th Cir.1983).

. Although the court suggests that appellants have waived aspects of their allegations, Op. at 763, 764, the record is clear that they have not abandoned their Establishment Clause charge of an unconstitutional endorsement of a religious denomination that is particularized to them personally. Oral Arg. Tr. at 8-10; 25. Counsel emphasized that it is appellants’ "direct contact [with the 4109 program and its message] because of the small community” that creates their injury, id. at 761-62, for due to their direct exposure as chaplains, they experience the 4109 program as a type of faith discrimination, “a religious gerrymander,” because "[i]t draws lines” to favor one religious faith over another. Id. at 762-63; see also Appellants' Br. at 27.

. See, e.g., Am. Soc.’y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus, 317 F.3d 334, 337-38 (D.C.Cir.2003).

. See, e.g., WEAL, 879 F.2d at 884-85; Gray v. Greyhound Lines, E., 545 F.2d 169, 175 (D.C.Cir.1976); see also Shaw v. Hunt, 517 U.S. 899, 904, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (citing United States v. Hays, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995); Shaw v. Reno, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)); Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); Richard H. Pildes & Richard G. Niemi, Expressive Harms, “Bizarre Districts,” and Voting Rights: Evaluating Election-District Appearances After Shaw v. Reno, 92 Mich. L.Rev. 483, 511-15 (1993); cf. Brown v. Bd. of Educ., 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

. See, e.g., Van Orden v. Perry, 545 U.S. 677, 682, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005); McCreary County, 545 U.S. at 853, 125 S.Ct. 2722; Lee, 505 U.S. at 581, 112 S.Ct. 2649; County of Allegheny v. ACLU Greater Pitts *770 burgh Chapter, 492 U.S. 573, 587, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); Edwards v. Aguillard, 482 U.S. 578, 581, 107 S.Ct 2573, 96 L.Ed.2d 510 (1987); Wallace v. Jaffree, 472 U.S. 38, 42, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); Lynch, 465 U.S. at 671, 104 S.Ct. 1355; see also Op. at 763-64 & n. 4.

. See, e.g., Agostini v. Felton, 521 U.S. 203, 223, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); County of Allegheny, 492 U.S. at 592-93, 109 S.Ct. 3086; Larkin v. Grendel's Den, Inc., 459 U.S. 116, 125-26, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982); Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Mt. Royal Joint Venture v. Kempthorne, 477 F.3d 745, 758 (D.C.Cir.2007); United Christian Scientists v. Christian Sci. Bd. of Dirs., First Church of Christ, Scientist, 829 F.2d 1152, 1161-62 (D.C.Cir.1987); Allen v. Morton, 495 F.2d 65, 69-70 (D.C.Cir.1973) (Tamm, J., joined by Robb, J., concurring).

. See also Instruction 1730.7B, Religious Ministry Support within the Department of the Navy ¶ 4.a (Dep’t of Navy, Ofc. of Sec’y Oct. 12, 2000); Instruction 1730.ID, Religious Ministry in the Navy ¶ 4 (Dep’t of Navy, Ofc. of Ch. of Naval Operations May 6, 2003).