The fact that national Republicans were apparently heavily involved in a process with which the Ohio State Legislature and its Task Force are statutorily tasked raises a genuine dispute about partisan intent in the work of the map-drawers. Viewed in the light most favorable to the Plaintiffs, such evidence shows that the task of drawing the maps was farmed out to the national Republican Party and that the bipartisan Task Force was shut out of the process. This evidence, if credited as presented at trial, helps satisfy the partisan intent element.
Moreover, the Plaintiffs plan to offer expert testimony that will, in part, go to proving partisan intent. The Plaintiffs argue that the "manner and extent to which the Republican mapmakers split political subdivisions and communities of interest, with resulting partisan gain, demonstrates their objective to crack and pack Democratic voters to optimize Republican seats in Congress." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 84) (Page ID # 8429). Plaintiffs' expert William Cooper states that the districts as drawn under the 2012 map "are not compact. Far too many counties and political subdivisions are split." Dkt. 177-4 (Cooper Dep. at 15) (Page ID # 8535). Cooper drew a Proposed Remedial Plan that splits significantly fewer counties and municipal civil divisions than the 2012 map. Dkt. 177-3 (Cooper Report at 11-14) (Page ID # 8519-22). Dr. Niven, another expert, will testify that the 2012 map split 322 census tracts, whereas the map in effect before the 2012 map's introduction split only 209 census tracts. Dkt. 179-8 (Niven Report at 5) (Page ID # 9926). Dr. Niven also explores several specific examples of district lines being drawn in a way that could indicate partisan intent. For example, Niven explains how the 2012 map divides Franklin County into three different congressional districts-the 3rd, 12th and 15th. Id. at 19-27 (Page ID # 9940-48). The 3rd district concentrated (packed) Democratic-leaning voters, creating a district nearly certain to elect a Democratic representative. Id. at 26 (Page ID # 9947). The 12th and 15th districts, however, chipped away (cracked) voters and merged them into districts that contained many Republican-leaning voters, thereby creating two districts that could be expected to elect Republican representatives. Id. at 22-25 (Page ID # 9943-46). Dr. Niven's *717 report states that the differences between the partisan leanings of the voters in the 3rd district and those in the 12th and 15th districts are statistically significant. Id. at 27 (Page ID # 9948). Further, Dr. Niven highlights several examples of highly irregular district borders drawn into the 2012 map, from which a reasonable fact-finder could infer partisan intent. See, e.g. , id. at 10 (Page ID # 9931). Dr. Niven concludes that "the districts have strategically targeted and divided populations" based on analysis of the extent to which census tracts are split under the present map. Id. at 4 (Page ID # 9925).
Furthermore, Dr. Wendy K. Tam Cho used a computer algorithm to generate over three million simulated congressional maps informed only by traditional districting principles such as contiguity, compactness, and city and county boundary preservation. Dkt. 179-11 (Cho Dep. at 129) (Page ID # 10032); Dkt. 179-10 (Cho Report at 40) (Page ID # 10025). Dr. Cho then compared the 2012 map to the non-partisan maps within her dataset to determine the extent to which they diverged. She found that none of her over three million simulated maps produced the same 12-4 seat share as the 2012 map. Dkt. 179-10 (Cho Report at 40) (Page ID # 10025). Dr. Cho found that "none of the simulated maps ... had the same partisan fairness metric of the challenged map" and that "[t]he responsiveness of the challenged map occurs in a very small number of [her] simulated maps." Id. The Plaintiffs argue that Dr. Cho's simulations provide additional evidence of the partisan intent on the part of the map-drawers.
From this evidence, along with other testimony, emails, and the like, a reasonable fact-finder could infer that a predominantly partisan intent informed the drawing of the congressional districts in the 2012 plan.
2. Partisan Effect and Statewide Associational Harm
The second element of the Fourteenth Amendment claim and non-associational First Amendment claim is partisan effect. The evidence presented for these claims must be district-specific. On this particular effect element, then, the evidence required for satisfying the substantive claim blends with the evidence required to establish standing. Accordingly, we detail the evidence on this particular claim when we address the individual Plaintiffs' standing. See infra Section II.C.1.a. As shown, at this stage, the Plaintiffs have enough evidence to establish an injury in fact for standing purposes, and likewise, to lead a rational finder of fact to conclude that the partisan effect element is satisfied.
The First Amendment associational claim, however, rests on separate, statewide evidence. The Plaintiffs point to record evidence outlined below that could support an associational harm. See also infra Section II.C.1.b.
Prior to the 2011 redistricting, Ohio had eighteen U.S. congressional districts. Due to population changes, the 2012 map had to be reduced to sixteen U.S. congressional districts. Dkt. 178-5 (Whatman Dep. at 159) (Page ID # 9664). The current congressional districting plan was first used in the 2012 election cycle. Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 3) (Page ID # 8348). Every election in which it has been used has resulted in the election of twelve Republican representatives and four Democratic representatives, with each district consistently electing a candidate from the same party. The 1st, 2nd, 4th, 5th, 6th, 7th, 8th, 10th, 12th, 14th, 15th, and 16th Districts have consistently elected Republicans while the 3rd, 9th, 11th, and 13th have elected Democrats. Id. at 87-88 (Page ID # 8432-33). In each of *718 these elections, 75% of the representatives elected in the State of Ohio were Republicans. But in the 2012 election, Republicans won only 51% of the state-wide vote. In 2014, they won only 59% of the state-wide vote. In 2016, they won only 57% of the state-wide vote. In 2018, they won only 52% of the state-wide vote. Id. at 86-87 (Page ID # 8431-32).
The 2012 map created the 3rd congressional district, a new heavily-Democratic district that some Republican map-drawers referred to as the "Franklin County Sinkhole." Id. at 81 (Page ID # 8426). In the 3rd district, Democratic candidates have won significantly more votes than were required to beat their opponents. In 2012, the Democratic candidate was elected with 68.29% of the vote, in 2014 with 64.05% of the vote, in 2016 with 68.57% of the vote, and in 2018 with 73.6% of the vote. Id. at 88 (Page ID # 8433). Democratic candidates in the 9th, 11th, and 13th districts have won by similarly high margins. Id. at 88-89 (Page ID # 8433-34).
The Plaintiffs plan to offer expert testimony to prove the partisan effect of the 2012 map. Dr. Christopher Warshaw states that since the enactment of the 2012 redistricted map partisan bias measures have increased. Dkt. 179-6 (Warshaw Dep. at 72-73) (Page ID # 9875-76). Dr. Warshaw presents four measures of partisan effect. First, the efficiency gap is one "commonly used metric[ ] to measure partisan bias." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 89) (Page ID # 8434). The efficiency gap is:
the difference between the parties' respective wasted votes, divided by the total number of votes cast in the election. All of a party's votes are wasted if they lose the election. When a party wins an election, the wasted votes are those above 50%+1 needed to win. The efficiency gap aggregates both kinds of wasted votes for each party. According to the efficiency gap analysis, the ratio of the parties' excess votes reveals the discrepancy between how the map treats the parties.
Id. (quotation marks omitted). Dr. Warshaw explains that Ohio's efficiency gap increased considerably between 2010 and 2012. Dkt. 177-5 (Warshaw Report at 23) (Page ID # 8613). His report states that there were pro-Republican efficiency gaps in the 2012, 2014, 2016, and 2018 elections, and that the 2012 and 2018 efficiency gaps were particularly large. Id. ; Dkt. 177-7 (Warshaw Suppl. Report at 3) (Page ID # 8672). Dr. Warshaw also states that the efficiency gaps under the 2012 redistricting plan are extreme compared to the efficiency gaps in other states. Dkt. 177-5 (Warshaw Report at 21-23) (Page ID # 8611-13).
The second measure of partisan effect is the mean-median gap. "If the party wins more votes in the median district than in the average district, they have an advantage in the translation of votes to seats," which is reflected by the mean-median gap measure. Dkt. 177-7 (Warshaw Suppl. Report at 3) (Page ID # 8672). Dr. Warshaw found that after the 2012 plan was implemented, there was a "sharp increase" in Ohio's mean-median gap. Dkt. 177-5 (Warshaw Report at 24) (Page ID # 8614).
The third measure is declination. Dkt. 177-7 (Warshaw Suppl. Report at 3) (Page ID # 8672). As explained by Dr. Warshaw:
The declination metric starts from the assumption that a plan that advantages one party will arrange the distribution of district vote shares in a way that treats the 50 percent threshold for victory differently than other vote values. The declination metric can be quantified using a number between -1 and 1 (positive values favor Democrats and negative values favor Republicans).
*719 Id. (citation omitted). The 2018 election resulted in a declination of -.69, which Dr. Warshaw concludes "was more extreme than 98% of previous elections and more pro-Republican than 99% of previous U.S. congressional elections." Id. Dr. Warshaw also found that "Ohio's post-2011 plans had some of the most extreme declinations in Ohio's history." Dkt. 177-5 (Warshaw Report at 25-26) (Page ID # 8615-16).
Finally, Dr. Warshaw utilizes a partisan symmetry metric. Dkt. 177-7 (Warshaw Suppl. Report at 3) (Page ID # 8672). This measures "whether each party receives the same share of seats for identical shares of votes." Id. Dr. Warshaw found that "Ohio's 2018 elections were more asymmetric than 92% of previous elections and more pro-Republican than 94% of previous U.S. congressional elections over the past 45 years." Id. at 4 (Page ID # 8673). He ran analyses on hypothetical elections in Ohio under the 2012 redistricting plan and found that they were more biased than comparable elections in other states. Dkt. 177-5 (Warshaw Report at 26-27) (Page ID # 8616-17). He also found that "Ohio's post-2011 elections were more asymmetric than previous congressional elections in Ohio" and that the 2012 election had more extreme asymmetry "than 96% of previous elections and [was] more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years." Id. at 27 (Page ID # 8617).
In addition to these four metrics, Dr. Warshaw analyzes the competitiveness of elections and "the responsiveness of each party's seat shares to uniform swings in the statewide vote share." Id. at 28 (Page ID # 8618). He considers an election competitive if "the winning party received less than 55% of the two-party vote." Id. Dr. Warshaw found that "Ohio's congressional elections grew less competitive after the 2011 plan went into place." Id. He also found that "Ohio's post-2011 districting plan had some of the least responsive election results in the country." Id. at 29 (Page ID # 8619). At this stage, drawing all inferences in favor of the non-moving party, the Plaintiffs have put forth sufficient record evidence to defeat the motion for summary judgment based on the partisan effect factor.
3. Lack of a Legitimate Justification and Causation
The third and final elements of the Plaintiffs' First and Fourteenth Amendment claims blend together. To illustrate: the Defendants may come forward with other legitimate justifications for the map, such as traditional redistricting criteria that include compactness and maintaining municipal and county boundaries, etc. If credited, this showing would indicate that a district's partisan effect is caused by, for example, the map-drawers' adherence to the State's pre-existing municipal and county subdivision boundaries and not by the Defendants' alleged predominantly partisan intent.
Although the Defendants contend that the map-drawers were focused on traditional districting criteria, the Plaintiffs' experts and arguments counter this contention. For example, the Plaintiffs argue that one reasonable inference that could be drawn from their evidence of partisan intent and the extreme partisan effect of the map could be that traditional districting criteria were not part of the map-drawers' calculus. The presence of contradictory evidence proffered by each side indicates that there is a genuine issue of material fact on this element, and thus granting summary judgment would be inappropriate. The Plaintiffs' offer of evidence to rebut any possible justifications, detailed below, is sufficient to survive summary judgment.
The Plaintiffs plan to offer expert testimony to prove that the 2012 map's partisan leanings are not the result of the *720 drawers' attempts to comply with traditional redistricting criteria. Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 99-102) (Page ID # 8444-47). Cooper has drafted a Proposed Remedial Plan that attempts to "undo the partisan gerrymander," Dkt. 177-4 (Cooper Dep. at 25) (Page ID # 8450), while still honoring traditional redistricting criteria such as one-person-one-vote, compactness, contiguity, incumbent protection, compliance with the VRA, and the preservation of communities of interest, Dkt. 177-3 (Cooper Report at 3) (Page ID # 8511). Cooper also drew his plan in compliance with the requirements of Ohio's 2018 Ballot Initiative. Id. Cooper's Proposed Remedial Plan splits only 14 counties whereas the 2012 map splits 23 counties. Id. at 11, 14 (Page ID # 8519, 8522). The Proposed Remedial Plan splits 27 municipal civil divisions whereas the 2012 map splits 73 municipal civil divisions. Id. Cooper's Proposed Remedial Plan also uses more compact districts than those in the 2012 map. Id. at 15-17 (Page ID # 8523-25). The Proposed Remedial Plan, had it been in effect for the 2012-2018 elections, arguably would have produced more Democratic representatives than the 2012 map. Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 97) (Page ID # 8442).
The Plaintiffs also point to deposition testimony that indicates that concerns beyond traditional redistricting criteria factored into the drawing of the 2012 map's lines. For example, DiRossi stated that the map-drawers did not use any system other than visual inspection to ensure that the districts they were drawing were compact. Dkt. 178-7 (DiRossi Dep. at 212) (Page ID # 9705). DiRossi also testified that "when you [are] doing redistricting and apportionment the first things that everybody want[s] from you [are] maps and indexes, maps and indexes ... the first thing that people wanted were historical political indexes and maps." Id. at 233 (Page ID # 9711).
The Defendants attempt to undercut any finding of partisan effect (and relatedly, intent) by arguing that because Democratic members of both the Ohio House of Representatives and State Senate voted for H.B. 369, any partisan effects of the map cannot be attributed to partisan intent. Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 2) (Page ID # 8347). The Plaintiffs assert that even though Democrats did vote for H.B. 369, many expressed their discontent with the bill and the way in which it was enacted arguably without sufficient time for parties to process and discuss its impact. They also argue that because Democrats were outnumbered in both the Ohio House and Senate, they did not have the ability to stop the enactment of the bill and therefore had power only to request minor tweaks to the plan. Id. at 83-84 (Page ID # 8428-29) (noting that Republican State Senator Larry Obhof stated, "While a lot of Democrats voted for the current map ... they didn't really have a lot of negotiating power at that stage," and further noting similar comments by then-Speaker of the State House William Batchelder). We conclude that a reasonable fact-finder could determine that, despite some Democrats having voted to approve H.B. 369, the map was drawn and enacted with partisan intent, and that it had a partisan effect.
Lastly, to rebut any contention that the VRA provides a justification for District 11, the Plaintiffs rely on expert Dr. Lisa Handley. See generally Dkt. 179-13 (Handley Report). Ohio's "[c]urrent 11th District is the successor district to the first majority black congressional district created in Ohio in 1968, which has consistently elected African-Americans to Congress since." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed *721 Facts at 98) (Page ID # 8443). The Supreme Court recently explained that:
When a State invokes the VRA to justify race-based districting, it must show (to meet the "narrow tailoring" requirement) that it had "a strong basis in evidence" for concluding that the statute required its action. Or said otherwise, the State must establish that it had "good reasons" to think that it would transgress the Act if it did not draw race-based district lines. That "strong basis" (or "good reasons") standard gives States "breathing room" to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed.
Cooper , 137 S.Ct. at 1464 (internal citations omitted). In this case, § 2 of the VRA would apply.
To establish a vote-dilution claim under § 2, a party must satisfy three threshold conditions, known as the Gingles preconditions. See Thornburg v. Gingles , 478 U.S. 30, 50-51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). We need not dive too deep into this line of cases at this time, but the most important precondition here is the third: "a district's white majority must 'vote [ ] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.' " See Cooper , 137 S.Ct. at 1470 (quoting Gingles , 478 U.S. at 51, 106 S.Ct. 2752 ). "If a State has good reason to think that all the ' Gingles preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district." Id.
Dr. Handley notes that the current Black Voting Age Population (BVAP) of District 11 is 52.4%, Dkt. 179-13 (Handley Report at 6 n.7) (Page ID # 10057), but she concludes that a 45% BVAP would allow "the black-preferred candidate [to] carry the district easily in all of the contests [that Dr. Handley] analyzed" in her report, id. at 15 (Page ID # 10066). Dr. Handley reaches this conclusion because "[a] substantial percent of white voters, though not a majority, tended to 'crossover' and support the black-preferred candidate." Id. at 11 (Page ID # 10062). For example, "[t]he 2014 gubernatorial contest was the only election in which less than a third of white voters supported the black-preferred candidate."Id. Moreover, Dr. Handley's analysis indicates "that support for [Congresswoman Marcia] Fudge is very high among both black and white voters." Id. at 3 n.3 (Page ID # 10054).
A plurality of the Supreme Court in Bartlett v. Strickland , and then a majority in Cooper , reasoned that, " '[i]n areas with substantial crossover voting [i.e., white voters voting with black voters],' § 2 plaintiffs would not 'be able to establish the third Gingles precondition' and so 'majority-minority districts would not be required.' " Cooper , 137 S.Ct. at 1472 (quoting Bartlett v. Strickland , 556 U.S. 1, 24, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) ). Therefore, "[t]o have a strong basis in evidence to conclude that § 2 demands [the] race-based steps [taken by Ohio in drawing District 11 as it did], the State must carefully evaluate whether a plaintiff could establish the Gingles preconditions-including effective white bloc-voting-in a new district created without those measures." Id. at 1471. At this stage, we conclude that Dr. Handley's analysis could, if credited at trial, rebut any evidence that the Ohio Legislature, in fact, had good reasons to believe that the State would be subject to § 2 liability with a BVAP under 50% and therefore that VRA compliance justified their drawing of the 11th district, which the Plaintiffs allege was intentionally packed for partisan reasons.
C. Standing
"[A] plaintiff seeking relief in federal court must first demonstrate that *722 he has standing to do so." Gill , 138 S.Ct. at 1923. Summarizing the applicable standing principles for vote-dilution claims in Gill , the Supreme Court explained that "the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes. In this gerrymandering context that burden arises through a voter's placement in a 'cracked' or 'packed' district." Id. at 1931. In other words, to establish standing for their vote-dilution claims, the Plaintiffs here (the individuals and the organizations) must each establish that they (or an organization's member) live in an alleged gerrymandered district just as in the racial gerrymandering context. See id. at 1930 ("A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.' " (quoting United States v. Hays , 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ) ). In pursuing these claims, we recognize that, as in other redistricting cases, "[v]oters, of course, can present statewide evidence in order to prove ... gerrymandering in a particular district." Ala. Legislative Black Caucus , 135 S.Ct. at 1265.
Additionally, the alleged separate associational harm under the First Amendment is a statewide injury. Accordingly, statewide standing principles apply. Gill , 138 S.Ct. at 1938-39 (Kagan, J., concurring). As mentioned, the Plaintiffs have not relied solely on First and Fourteenth Amendment vote-dilution theories, and thus, we will address whether they have standing under this additional associational theory as well.[4]
The Plaintiffs have put forward sufficient evidence to establish standing at this stage. We will address the individual and organization Plaintiffs successively.
1. Individual Plaintiffs
To establish standing, the individual Plaintiffs must show: (1) "an injury in fact"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that "it must be likely ... that the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). At least one "plaintiff must demonstrate standing for each claim ... press[ed] and for each form of relief that is sought." Davis v. Fed. Election Comm'n , 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) ; see also Town of Chester v. Laroe Estates, Inc. , --- U.S. ----, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). These requirements ensure that plaintiffs who invoke a federal court's jurisdiction have "a personal stake in the outcome of the controversy," Baker , 369 U.S. at 204, 82 S.Ct. 691, and that the federal court does not become "a forum for generalized grievances," Lance v. Coffman , 549 U.S. 437, 439, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007).
a. Fourteenth Amendment Claims
To establish their vote-dilution claims, the Plaintiffs rely on individual lay and expert testimony, simulated maps, and a Proposed Remedial Plan map. Dkt. 177 (Pls.' Opp'n to Summ. J. at 43-51) (Page ID # 8319-27). Based on this proffered evidence, the individual Plaintiffs have made a sufficient showing, at summary judgment, that they live in packed or cracked districts in which their votes are diluted.
*723 Injury-In-Fact
First, the Defendants do not dispute each individual Plaintiff's address or where they vote. See Dkt. 136-1 (Defs.' Prop. Statement of Undisputed Material Facts at 5-36) (Page ID # 3583-3614). Thus, there is no dispute over whether the individual Plaintiffs reside and vote in the districts alleged to be cracked or packed.
Second, of course, the individual Plaintiffs are not contending that their votes are not counted in a literal sense, see, e.g. , Dkt. 177-10 (Goldenhar Dep. at 41) (Page ID # 8794), and the Defendants repeatedly note the fact that the Plaintiffs make no such claim. The individual Plaintiffs' claim is of another nature: they argue that their votes count less than they should, or are diluted, because of aggressive partisan efforts to configure district lines in a way that intentionally "wastes" their votes. See, e.g. , Reynolds , 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."); see also Gaffney v. Cummings , 412 U.S. 735, 754, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (noting that it may violate the Fourteenth Amendment if a political group's "voting strength [is] invidiously minimized."); Dkt. 177-10 (Goldenhar Dep. at 41-42) (Page ID # 8794-95) (Plaintiff Goldenhar stating that her "sense is [her] vote doesn't matter as much in terms of how [she] would be represented by a representative" and that her "views tend not to be represented, because the outcome of the elections are more predetermined based on how the map is drawn.").[5] Accordingly, we evaluate the Plaintiffs' standing by turning to the evidence put forward by the Plaintiffs to support their vote-dilution claims and allegations of packing and cracking Democratic voters.
First, Dr. Cho's map simulations represent district-specific evidence to support each individual Plaintiff's standing. Dr. Cho was provided each Plaintiff's home address. Dkt. 179-10 (Cho Report at 11) (Page ID # 9996). From that, she was "able to determine which district the plaintiff would reside in in each simulated map." Id. Dr. Cho "compute[d] the average Democratic vote share for the plaintiff's current district ... from 2012 to 2016[,]" and then "calculate[d] the average Democratic vote share for the plaintiff's district in the simulated maps with the 2008-2010 statewide election data." Id. As a result, Dr. Cho presents "a comparison of the average Democratic vote share of each plaintiff's current district with the calculated set of average Democratic vote shares for each plaintiff's set of simulated districts." Id. The sample of simulated maps "is comprised of 3,037,645 map draws that adhere to ... traditional redistricting principles ... (population deviation, contiguity, compactness, the creation of a 45+% BVAP [Black Voting Age Population] district, and city and county preservation)[,]" but the simulated maps were not generated using "partisan or electoral information"-they are completely devoid of partisan intent. Id. at 10 (Page ID # 9995).
Dr. Cho's report shows that each individual Plaintiff's current district is either substantially more Republican than the vast majority of, or all of, the 3-million-plus hypothetical, alternate districts that they could live in (i.e., cracked), or that the *724 current district is substantially more Democratic than the vast majority of, or all of, the alternate districts (i.e., packed). See id. at 13-29 (Page ID # 9998-10014). Some specific examples provide a better illustration. Take Plaintiff Rubin, who lives in District 16. Dr. Cho concludes that "[a]mong the set of simulated maps, 100% of them would have placed Plaintiff Rubin in a district that would have provided a higher likelihood of electing a Democrat." Id. at 29 (Page ID # 10014).[6] For all the Plaintiffs in other allegedly cracked districts (except one, Plaintiff Thobaben in District 15, id. at 28 (Page ID # 10013) (79.28%) ), Dr. Cho concluded that, among the simulated maps, 95% or more would have placed the Plaintiffs in a district that would have a higher likelihood of electing a Democrat. This is not to say that the Plaintiffs in these districts have a right to elect a Democrat; this evidence, however, helps to show that a district is cracked.
On the other end of the spectrum are individual Plaintiffs who assert that their injury is having been packed into heavily Democratic districts. One such example is Plaintiff Inskeep, who lives in District 3. Dr. Cho concludes that, "[a]mong the set of simulated maps, none of them would have placed Plaintiff Inskeep in a district that would have provided a higher likelihood of electing a Democrat." Id. at 15 (Page ID # 10000). Plaintiff Harris, in District 11, and Plaintiff Myer, in District 13, are in the same camp. Id. at 24, 26 (Page ID # 10009, 10011). Lastly, Plaintiffs Walker and Rader each live in District 9, and only 15.91% and 13.55% of the simulated maps, respectively, would provide them with a higher likelihood of electing a Democrat. Id. at 21-22 (Page ID # 10006-07). Again, this evidence could be understood to indicate that a district has been packed.
After generating the simulated maps, Dr. Cho analyzed that universe of alternative feasible maps for competitiveness, responsiveness, and partisan bias and compared that analysis to the same measures for the current map. See id. at 30-40 (Page ID # 10015-25). This analysis allowed Dr. Cho to assess the comparative partisan bias and effect of the current map. She concluded that "on an array of partisan metrics that seek to measure either competitiveness or biasedness, the current plan exhibits more partisan unfairness than most of the simulated maps."Id. at 40 (Page ID # 10025). For example, Dr. Cho explains that "[w]hen voters are 'packed and cracked' into districts, the districts are safe and not competitive[,]" and concludes that "it seems that competitiveness was almost a non-existent factor if one at all in the construction of the enacted map since the current districts lean so heavily toward one party." Id. at 32, 37 (Page ID # 10017, 10022).
We conclude that Dr. Cho's analysis supports the individual Plaintiffs' standing. As the Supreme Court explained in Gill , for partisan gerrymandering claims, the harm of vote dilution "arises from the particular composition of the voter's own district, which causes his [or her] vote-having been packed or cracked-to carry less weight than it would carry in another, hypothetical district." Gill , 138 S.Ct. at 1930-31. Dr. Cho's report could be interpreted to show just that, on a district-by-district basis, for each individual Plaintiff, which is sufficient to establish their standing at this juncture.
Dr. Warshaw's report provides additional support for the Plaintiffs' injuries in fact. Dr. Warshaw employs four partisan bias metrics-the efficiency gap, the mean-median *725 gap, symmetry in the vote-seat curve across parties, and declination-to measure the partisan advantage of the current plan. Dkt. 177-5 (Warshaw Report at 5-13) (Page ID # 8595-8603). Based on these measures, Dr. Warshaw concludes that "Democratic voters in Ohio are efficiently packed and cracked across districts.... As a result, Ohio's elections are unresponsive to normal shifts in voters' preferences within the historical range of congressional election results in Ohio." Id. at 4 (Page ID # 8594). Dr. Warshaw's analyses constitute statewide evidence that bolsters Dr. Cho's district-specific evidence.
The Plaintiffs also propose an alternative map called the Proposed Remedial Plan. See Dkt. 177-3 (Cooper Report at 13) (Page ID # 8521). This Proposed Remedial Plan, in part, lends further support to establishing the individual Plaintiffs' injuries in fact as well as the third requirement for standing-redressability. As Dr. Warshaw concludes, using the same partisan-bias metrics that he used to analyze the current map, "the remedial plan ... displays very low levels of partisan bias and high levels of responsiveness. Thus, [Dr. Warshaw] believe[s] that the remedial plan would improve the representational link between voters and Ohio's members of Congress." Dkt. 177-5 (Warshaw Report at 43) (Page ID # 8633). In other words, the Proposed Remedial Plan aims to present concrete examples of other possible districts in which the Plaintiffs' votes would carry more weight than they do under the current districts by unpacking and uncracking those voters. See Gill , 138 S.Ct. at 1931.
In sum, the Plaintiffs have presented evidence that they actually live in packed or cracked districts and, consequently, that they have suffered injuries in fact. After trial, if this Court accepts this evidence and these experts' conclusions, the Plaintiffs could establish sufficient evidence to maintain standing. See id. ("The facts necessary to establish standing ... must ... [be] proved at trial.").
Causation
The individual Plaintiffs have presented evidence from which a trier of fact could conclude that their current districts caused their individual injuries. For example, Dr. Cho states that "none of [her simulated maps] had the same 12-4 seat share as in the challenged map." Dkt. 179-10 (Cho Report at 40) (Page ID # 10025) (emphasis added); see also id. at 33-37 (Page ID # 10018-10022) (analyzing competitiveness and concluding that the simulated maps are more competitive than the current map, thus providing evidence that the current map packs and cracks voters). Moreover, Plaintiffs' expert Cooper provides evidence that the current districts cause the individual Plaintiffs' injuries. See generally Dkt. 177-3 (Cooper Report). Specifically, Cooper drew a Proposed Remedial Plan that splits fewer counties and adheres to traditional redistricting principles ("one-person-one-vote, incumbent non-pairing where possible, compactness, contiguity, the non-dilution of minority voting strength, and respect for communities of interest"). See id. at 11, 14-18 (Page ID # 8519, 8522-26). Cooper further shows that his Proposed Remedial Plan "undoes the partisan gerrymander by giving Democratic voters a better opportunity to elect their candidates of choice than under the 2012 Plan." Id. at 18 (Page ID # 8526); see also id. at 20 (Page ID # 8528) (Figure 8: comparing, district-by-district, 2012-2016 elections results under the 2012 plan with what the results may have been under the Proposed Remedial Plan). As mentioned, Dr. Warshaw's report bolsters this conclusion. See Dkt. 177-5 (Warshaw Report at 43) (Page ID # 8633).
*726 Redressability
Finally, the Plaintiffs have established for the purposes of summary judgment that a favorable decision would redress their injuries because they seek an injunction that prohibits the State from conducting future elections under the current map and, in its place, the implementation of a non-gerrymandered map that does not dilute their votes. See Dkt. 37 (Second Am. Compl. at 51 - 52) (Page ID # 337-38). The Proposed Remedial Plan offers one possible example of how such a non-gerrymandered map might be drawn.
b. First Amendment Claims
For the individual Plaintiffs' standing to bring their First Amendment claims, we first note that, to the extent that the First Amendment theory is based upon vote dilution, the same analysis applies as in the Fourteenth Amendment context. See, e.g. , Benisek , 348 F.Supp.3d at 514 ("[Voters] have a right under the First Amendment not to have the value of their vote diminished because of the political views they have expressed through their party affiliation and voting history. Put simply, partisan vote dilution, when intentionally imposed, involves the State penalizing voters for expressing a viewpoint while, at the same time, rewarding voters for expressing the opposite viewpoint."). We therefore conclude that, for purposes of summary judgment, the individual Plaintiffs have established standing for their First Amendment vote-dilution claim.
A separate analysis, however, applies to the First Amendment associational claim. In her Gill concurrence, Justice Kagan explained why the plaintiffs in that case failed to establish standing under this theory: "[The plaintiffs] did not emphasize their membership in [the Democratic] [P]arty, or their activities supporting it. And they did not speak to any tangible associational burdens-ways the gerrymander had debilitated their party or weakened its ability to carry out its core functions and purposes." Gill , 138 S.Ct. at 1939 (Kagan, J., concurring). Accordingly, to establish standing on their associational claim, the individual Plaintiffs must (1) point to evidence of their membership in and activities supporting the Democratic Party, and (2) to establish an injury in fact, the Plaintiffs must demonstrate that the allegedly gerrymandered map weakened their party's ability to carry out its core functions and purposes.
The remainder of this section will focus on the individual Plaintiffs' standing to bring this First Amendment associational claim. We conclude that they have put forward sufficient evidence to establish standing.
Injury in Fact & Causation
First, the individual Plaintiffs self-identify as Democrats or Democratic voters and actively support the Democratic Party. See generally Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 102-34) (Page ID # 8447-79). The individual Plaintiffs describe numerous examples of how the allegedly gerrymandered districts hinder their ability to engage in a variety of political activities-from voter apathy disrupting the party's mobilization and candidate recruitment efforts, to decreased fundraising, to both a general decline in political activity in districts (such as candidates not appearing at forums) and an inability meaningfully to influence representatives because the election results are essentially predetermined. See id. ; see also Dkt. 177 (Pls.' Opp'n to Summ. J. at 53-56) (Page ID # 8329-32) (citing and highlighting some specific examples). In short, as a threshold matter, the individual Plaintiffs here have done what the Gill plaintiffs failed to do.
Second, the individual Plaintiffs back up their testimonial evidence with *727 data on asymmetric election results. Importantly, "statistical metrics [of partisan asymmetry] measure ... a gerrymander's effect on the fortunes of political parties and those associated with them." Gill , 138 S.Ct. at 1939 (Kagan, J., concurring) (quotation marks to the majority opinion omitted). "[E]vidence of partisan asymmetry well fits a suit alleging associational injury." Id.
Here, the Plaintiffs have presented evidence of asymmetry to establish both an injury in fact and causation. See generally Dkt. 177-5 (Warshaw Report at 43) (Page ID # 8633) (analyzing the current plan using the efficiency gap, the mean-median gap, declination, and partisan symmetry metrics, and concluding that "[t]he pro-Republican advantage in congressional elections in Ohio causes Democratic voters to be effectively shut out of the political process in Congress."); Dkt. 177-7 (Warshaw Suppl. Report at 1) (Page ID # 8670) (applying these metrics to the 2018 election results and concluding that there is strong evidence of partisan bias and that bias "has been durable between the 2012 and 2018 elections."); see also Dkt. 177-3 (Cooper Report at 20) (Page ID # 8528) (comparing the 2012-2016 elections results under the current plan with what the results may have been under the Proposed Remedial Plan and showing that Democratic candidates likely would have won more seats or have been more competitive). Moreover, the Plaintiffs point out that, despite Democrats winning between 39% and 47% of the state-wide vote, Democratic candidates have won only 25% of Ohio's congressional elections under the current map; meanwhile, the Republican state-wide vote share has fluctuated between 51% and 59%, but Republican candidates have won 75% of those elections. Dkt. 177 (Pls.' Opp'n to Summ. J. at 21) (Page ID # 8297). Part of Dr. Cho's analysis provides additional support. See Dkt. 179-12 (Cho Suppl. Report at 3) (Page ID # 10045) ("In each of the simulation analyses [using data from the 2008-2018 election cycles], 9 Republican seats is the common and expected outcome of a non-partisan map creation process.").
We recognize that the Defendants present experts and evidence of their own, which attempt to discredit and undermine the Plaintiffs' case. At summary judgment, however, we must draw all reasonable inferences in the Plaintiffs' favor, and we do not find that any of the Defendants' evidence so undermines the evidence put forth by the Plaintiffs that reasonable inferences in the Plaintiffs' favor could not be made. Adhering to that standard, we conclude that the Plaintiffs have sufficiently established an injury in fact and causation under this theory of standing.
Redressability
As with the Fourteenth Amendment claims, the individual Plaintiffs satisfy redressability as well. See supra Section II.C.1.a. (Redressability).
c. Article I Claims
We previously applied the same standing analysis to the Plaintiffs' Article I claim as their First Amendment claims, OAPRI , 335 F.Supp.3d at 1001, and in this opinion, we have explained further that both claims share a statewide harm in common, see supra Section II.A.3. Accordingly, as with the First Amendment claims, the Plaintiffs have established standing for this claim as well.
2. Organizational Plaintiffs
We note that the Defendants' motion for summary judgment, which discusses standing at length, does not break out its challenge to the organizational Plaintiffs' standing from that of the individual Plaintiffs. We discuss the organizational Plaintiffs' standing separately, however, because the injuries that they allege are somewhat different in nature. An organization *728 has standing in its own right when it can show the same three elements that the individual Plaintiffs need to establish. See Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp. , 725 F.3d 571, 576 (6th Cir. 2013). Moreover, an organization has associational standing when: "(1) the organization's 'members would otherwise have standing in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " Friends of Tims Ford v. Tenn. Valley Auth. , 585 F.3d 955, 967 (6th Cir. 2009) (quoting Hunt v. Wash. State Apple Adver. Comm'n , 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) ). When the Plaintiffs' standing is challenged in a motion for summary judgment, "the plaintiffs must, in the words of [ Federal Rule of Civil Procedure 56 ], set forth specific facts, in affidavits or through other evidence, demonstrating that each element of standing is satisfied." Ctr. for Biological Diversity v. Lueckel , 417 F.3d 532, 537 (6th Cir. 2005) (internal quotation marks omitted).
The Plaintiffs assert that they have associational standing for their vote-dilution claim. Dkt. 177 (Pls.' Opp'n to Summ. J. at 45) (Page ID # 8321). The Plaintiffs also assert that they have associational standing, as well as standing in their own right, to pursue their First Amendment claims. Id. at 57, 61 (Page ID # 8333, 8337). They have put forth the deposition testimony of the various organizational Plaintiffs to substantiate their assertion of standing. Each organization's evidence to support standing will be addressed in turn.
OAPRI
OAPRI's activities include "voter education, voter registration, civic engagement, voter outreach, and encouraging people to vote." Dkt. 177 (Pls.' Opp'n to Summ. J. at 58) (Page ID # 8334). Andre Washington, the state president of OAPRI, is the organization's Rule 30(b)(6) representative. At his deposition, Washington testified that Ohio's congressional lines meant that OAPRI had "to use more resources to ... educate people on the importance of voting ... to explain to people that your vote does count." Dkt. 178-1 (Washington Dep. at 70) (Page ID # 9589). He stated that "if the districts weren't so gerrymandered, we could use our resources to register more people." Id. at 126 (Page ID # 9600). He further stated that
with this gerrymandered map, candidates don't come out to forums. We hold forums and they don't show up because they don't need to because they're either in a packed or cracked district and they just don't think that they need to be held accountable to the voters because they're going to win regardless.
Id. Washington testified that in District 12, he has "knocked on doors and it seems like every third door that [he] knock[s] on people are saying my vote doesn't count in this district, it doesn't matter, the same person is going to get back in office." Id. at 73 (Page ID # 9591). He testified that he himself is "in a cracked district where sometimes [he] feel[s] like [his] vote doesn't matter because it's diluted in this big sea." Id. at 106 (Page ID # 9599).
LWVO
LWVO "registers voters, educates voters on voter ID laws, hosts candidate forums, and recruits poll workers." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 63) (Page ID # 8408). It also "engages in [get-out-the-vote] efforts, including voter education about deadlines and early voting." Id. The organization has 2,700 to 2,800 members. Id. Jennifer Miller, the executive director of LWVO, is the group's Rule 30(b)(6) representative. At her deposition, Miller testified that "every *729 two years there is a State convention where [LVWO's] priorities are brought to the floor for [its] member delegates to vote on and fair districts is a long-standing topic in those conventions that is supported by [its] membership." Dkt. 177-27 (Miller. Dep. at 51) (Page ID # 9491). Miller further stated that LWVO planned congressional candidate forums that Congressman Steve Stivers and Congressman Jim Jordan did not attend and that "if [Stivers and Jordan] were worried about the outcome of an election, they would take the opportunity to talk to voters directly." Id. at 94-95 (Page ID # 9501-02). She testified to planning these events but "having to tell the other candidate that they can't speak to the constituents either" because some candidates chose not to attend which caused "a lot of wasted time, a lot of wasted energy." Id. at 94 (Page ID # 9501). Miller further testified that "the 2012 Plan had forced the League to divert resources from voter-education efforts to attempts to pass redistricting reform to ensure fair maps." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 65) (Page ID # 8410).
NEOYBD
NEOYBD is a group that "looks to mentor, empower and recruit the next generation of young people of color who want to be involved in the political process." Dkt. 178-2 (Jackson Dep. at 8) (Page ID # 9606). The organization educates people on "why [their] vote matters, why [they] should be voting," and "concrete issues that are on the ballot." Id. at 9 (Page ID # 9607). "NEOYBD has about sixty members, all Democrats and regular voters, who currently live in Ohio U.S. Congressional districts 9, 11, 13, and 14." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 146) (Page ID # 8491). Gabrielle Jackson, the president of the organization, was its Rule 30(b)(6) representative. Jackson testified that her group fundraises for candidates and for the group itself. She stated that "it's been challenging based on the way this map is currently drawn, because folks have been feeling like, you know, [their] voices aren't being heard. So it's causing us to use more of our resources, when we have a hard time bringing in resources." Dkt. 178-2 (Jackson Dep. at 23) (Page ID # 9614). Jackson testified that the current map means that members of her group's "voices are diluted, because of the packed district ... [as are] our voice and representation and accessibility to candidates." Id. at 67 (Page ID # 9629). Jackson testified that while canvassing and phone-banking with her organization, she spoke with people who expressed apathy about voting and said that they did not believe that their votes mattered. Id. at 69 (Page ID # 9630). Jackson further testified that the current map limits the locations where the organization chooses to have fundraisers. She stated that "in certain parts, for example, in District 14, we don't have fundraisers there, because there is no reach there." Id. at 85 (Page ID # 9634).
OSU College Democrats
The OSU College Democrats "advocate, educate, and engage people at OSU in alignment with the Democratic Party's platform." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 66) (Page ID # 8411) (internal quotation marks omitted). "The organization participates in election activities, including voter registration," canvassing and phone-banking, and held a fundraiser for Danny O'Connor, who was a Democratic candidate for Congress in the Twelfth Congressional District. Id. at 67 (Page ID # 8412). Alexis Oberdorf is the President of the OSU College Democrats and is the group's Rule 30(b)(6) representative. Id. at 66 (Page ID # 8411). Oberdorf testified that members of her organization did informal outreach *730 to their friends in the lead-up to election and the most common reason that they identified for not planning to vote was that they felt that their votes did not matter. Dkt. 177-28 (Oberdorf Dep. at 70-71) (Page ID # 9548-49). Oberdorf testified that OSU students living near campus reside in the 3rd, 12th, and 15th congressional districts. Id. at 103 (Page ID # 9560). She testified that having students split among the three different districts made it more difficult to "disseminate information on elections" and caused confusion among students "who just assume that they can vote in the same area that their friends can." Id. at 69 (Page ID # 9547). She testified that her organization has "done coordinated call campaigns for bills that [it] oppose[s]" to representatives from those districts and has found "it challenging especially to contact or get ... a response from those individuals." Id. at 103 (Page ID # 9560). For example, Oberdorf testified that her organization has had trouble getting Joyce Beatty, the representative from the 3rd district, to speak at their meetings, observing that Beatty has "won her elections by huge, huge leads" and that there is therefore "no ... pull for her to come speak to College Democrats." Id. at 103-04 (Page ID # 9560-61).
HCYD
HCYD is composed of around 150 members who live in the First and Second Congressional Districts. Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 149) (Page ID # 8494). Nathaniel Simon is HCYD's Rule 30(b)(6) representative. At his deposition, Simon testified that he believes that under the Plaintiffs' Proposed Remedial Plan "it would be much easier to engage voters and members about which district they live in and which candidates to advocate for" because under the current map "the City of Cincinnati is split, and so there's a lot of confusion regarding which candidate represents which individual and which area." Dkt. 178-3 (Simon Dep. at 20) (Page ID # 9639). He further stated that, although the current map "hasn't prevented [HCYD] from engaging in get out the vote activities, ... it's made it a lot tougher." Id. at 31 (Page ID # 9641). He also stated that the organization has "seen less-fewer people volunteer or give money because-and they have stated that it's because of just feeling apathetic and that it won't-them volunteering or contributing anything will [not] meaningfully effect any change." Id. at 56 (Page ID # 9647).
* * *
For purposes of summary judgment, the organizational Plaintiffs have put forth sufficient evidence to establish standing for their First Amendment claim.[7] See Gill , 138 S.Ct. at 1938-39 (Kagan, J., concurring). As to the organizational Plaintiffs' standing in their own right, they generally characterize their injury as a harmed ability to associate-"the map mak[ing] it more difficult to engage voters, [requiring them to] use additional resources, and impair[ing] the efficacy of their work." Dkt. 177 (Pls.' Opp'n to Summ. J. at 58) (Page ID # 8334). As catalogued above, they offer testimonial evidence that raises a question of fact as to whether there is a "causal connection between the injury and the challenged conduct"-that the districts in the enacted map are at least in part responsible for the associational difficulties that the organizations face. Miami Valley , 725 F.3d at 576. Finally, the organizational Plaintiffs have also raised a genuine issue of fact as to whether "the requested relief will redress the injury"-whether redrawing *731 the districts, for example in the manner advocated by the Proposed Remedial Plan, would allow the parties to allocate resources more efficiently and to engage with voters in a more effective manner or whether more competitive districts would decrease the voter apathy that hinders the organizations' work.
At this stage in the litigation, the organizational Plaintiffs have established associational standing on behalf of their members for the vote-dilution claims (both under the First Amendment and the Equal Protection Clause) as well. They have shown that "the organization's 'members would otherwise have standing to sue in their own right.' " Friends of Tims Ford , 585 F.3d at 967 (quoting Hunt , 432 U.S. at 343, 97 S.Ct. 2434 ). The Democratic organizations' members are Ohio Democratic voters, and the Plaintiffs have pointed to evidence from which it could be inferred that such voters were intentionally placed in packed and cracked districts where the power of their votes would be diluted. We have detailed this evidence in the context of the individual Plaintiffs above. More particularly, the OSU College Democrats "generally live in the Third, Twelfth or Fifteenth Congressional Districts" and "the bulk of the members are registered to vote at their school address." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 140) (Page ID # 8485). The OSU College Democrats therefore claim that "[t]he votes of the members of the OSU College Democrats have been diluted due to the construction of the Third, Twelfth, and Fifteenth Congressional Districts." Id. NEOYBD has around sixty members who vote for Democratic candidates and live in four different U.S. congressional districts. Id. at 146 (Page ID # 8491). HCYD's approximately 150 Democratic members live in the First and Second Congressional Districts. Id. at 149 (Page ID # 8494). OAPRI "has members living in nearly every congressional district throughout the state [of Ohio]." Id. at 142 (Page ID # 8487). For example, Andre Washington, the organization's president, lives in District 12, which is alleged to encompass a part of a cracked Democratic population center. Id. at 143 (Page ID # 8488). Stephanie White, another OAPRI member who identifies as a Democrat, lives in the Fifth Congressional District. Id. at 144 (Page ID # 8489). She believes that the Fifth Congressional District cracks Democrats and thereby dilutes her vote. Id. at 144-45 (Page ID # 8489-90). Finally, LWVO has 2,700 to 2,800 members in Ohio, some of whom reside in each of Ohio's sixteen U.S. congressional districts, which they claim are packed or cracked, resulting in dilution of their votes. Id. at 134-35 (Page ID # 8479-80).
The organizational Plaintiffs have also established that the interests that they seek to protect in this litigation "are germane to the organization's purpose." Friends of Tims Ford , 585 F.3d at 967 (quoting Hunt , 432 U.S. at 343, 97 S.Ct. 2434 ). NEOYBD, OSU Democrats, and HCYD seek to organize Democratic voters to elect Democratic candidates. They point to testimony from which a reasonable fact-finder could infer that these aims are hindered by the current district map. Additionally, OAPRI and LWVO seek to engage and educate voters and they argue that these efforts are hampered by packed or cracked districts that dilute people's votes, which in turn causes voter apathy and confusion. In fact, all of the organizational Plaintiffs have stated that voter confusion and apathy have resulted from the current map's alleged packing and cracking of voters, making the organizations' work more difficult and forcing them to expend greater resources to counteract these results. The organizations have averred that the uncompetitive races in certain districts resulting from the current districting mean that candidates and representatives are less responsive to the organizations *732 and less likely to attend voter forums that they organize. Lastly, the Defendants do not argue that "[ ]either the claim asserted [ ]or the relief requested requires the participation of individual members in the lawsuit." Id. (quoting Hunt , 432 U.S. at 343, 97 S.Ct. 2434 ); see Dkt. 136 (Mot. for Summ. J. at 11-30) (Page ID # 3556-75); Dkt. 190 (Defs.' Reply at 13-16) (Page ID # 11159-62).
III. CONCLUSION
For the foregoing reasons, we DENY the motion for summary judgment (Dkt. 136, 140).

The same statewide analysis applies to the individual Plaintiffs' Article I claim, too. See infra Section II.C.1.c.

We quote Plaintiff Goldenhar's deposition by way of example. Other examples of how individual Plaintiffs articulate this point abound. See generally Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 10-61) (Page ID # 8355-8406); Dkt. 177 (Pls.' Opp'n to Summ. J. at 43-45) (Page ID # 8319-21) (summarizing the individual Plaintiffs' deposition testimony).

See also id. at 18-20 (Page ID # 10003-05) (same for Plaintiff Boothe in District 6, Plaintiff Griffiths in District 7, and Plaintiff Nadler in District 8); id. at 25, 27 (Page ID # 10010, 10012) (same for Plaintiff Dagres in District 12 and Plaintiff Hutton in District 14).

As noted, essentially the same analysis applies to the Article I claim. See supra Section II.A.3.